AFFILIATED DISTILLERS BRANDS CORP., A CORPORA-
TION OF THE STATE OF NEW YORK, RESPONDENT-
CROSS-APPELLANT, v. ARTHUR J. SILLS, ATTORNEY
GENERAL OF THE STATE OF NEW JERSEY, AND JO-
SEPH P. LORDI, DIRECTOR OF THE DIVISION OF AL-
COHOLIC BEVERAGE CONTROL OF THE DEPARTMENT
OF LAW AND PUBLIC SAFETY OF NEW JERSEY, AP-
PELLANTS-CROSS-RESPONDENTS.

Argued April 7, 22, 1970 — Decided June 1, 1970.

*Mr. Elias Abelson,* Assistant Attorney General, argued the cause for appellants-cross-respondents (*Mr. George F. Kugler, Jr.,* Attorney General of New Jersey, attorney; *Mr. Philip S. Carchman,* Deputy Attorney General, on the brief).

*Mr. Charles Danzig* argued the cause for respondent-cross-appellant (*Messrs. Riker, Danzig, Schere & Brown,* attorneys; *Mr. Peter L. Berkley* on the brief).

*Mr. John J. Francis, Jr.,* argued the cause for certain wholesalers as *amicus curiae* (*Messrs. Shanley & Fisher,* attorneys; *Messrs. Pitney, Hardin & Kipp* and *Mr. William P. Reiss,* of counsel; *Mr. John J. Francis, Jr.* and *Mr. Harold H. Fisher* on the brief).

The opinion of the court was delivered by

PROCTOR, J. Plaintiff, Affiliated Distillers Brands Corporation (Affiliated), is a wholly owned subsidiary of Schenley Industries, Inc., a Delaware corporation. The latter has been engaged for many years in distilling, blending, importing and marketing distilled spirits and wines. Affiliated brought this action in the Chancery Division seeking to

have Chapters 58 and 59 of the Laws of 1966 declared unconstitutional and enjoined as unenforceable. In the alternative, plaintiff sought a declaration that Chapter 58 is not applicable to it because it qualifies for an exception contained within the statute. The Chancery Division held that Chapter 58 was unconstitutional; it refused to pass upon the validity of Chapter 59 because the plaintiff failed to show a conflict between the latter statute and plaintiff's actions or plans. 106 *N. J. Super.* 458 (1969). The defendants, the State Attorney General and the Director of the Division of Alcoholic Beverage Control, appealed from the declaration of unconstitutionality of Chapter 58 and the plaintiff cross appealed from the ruling on Chapter 59. While these appeals were pending in the Appellate Division, we certified the matter on our own motion.

The two chapters which plaintiff attacks are amendments to certain statutes dealing with the regulation of the distribution of alcoholic beverages. Chapter 58 is an extension of New Jersey's "tied house" prohibition (*N. J. S. A.* 33:1–43) and deals with the manufacturer-wholesaler relationship. Chapter 59 deals with the separate problem of manufacturers discriminating among wholesalers. Affiliated's attacks on the legislation are primarily grounded on provisions of the United States and New Jersey Constitutions. It contends that the legislation is not in the public interest and was enacted for the "private, anti-competitive interests" of an organized group of wholesalers, the New Jersey Wine and Spirit Wholesalers Association (Association). In support of its claim, Affiliated produced evidence of the events leading up to the enactment of the challenged legislation.

For many years Affiliated has been the marketing agent for the various alcoholic beverages which Schenley manufactures and imports, and has held a plenary wholesale license under *N. J. S. A.* 33:1–11(1). The license allowed Schenley, through Affiliated, to promote the sales of its products with the various retail outlets. Had Affiliated filed a price list for the wholesale to retail sales of alco-

holic beverages, it could have sold directly to retailers, but it never filed such a list since its practice was to sell only to other wholesalers. In 1964, Affiliated became concerned about the deteriorating position of Schenley products in the New Jersey market. Affiliated's president testified that Schenley's share of sales in New Jersey had decreased from 22% to 6% between 1946 and 1964. It was his opinion that Schenley's position could be improved if Affiliated, through its current license, began selling on a wholesaler to retailer basis while at the same time retaining existing distributors. He believed that if Affiliated "operated our own wholesale house and put forth all of our own efforts, that we could stimulate retailer interest as well in our brands beyond that which we had and that using our own house as sort of a bell cow house, that the other distributors would be more alert and fight for the business and that our sales overall would show a considerable increase." He added that Affiliated did not intend to cut prices.

In accordance with its plan, Affiliated rented a warehouse, entered into a trucking contract, hired a sales manager, and began to interview prospective salesmen. On April 1, 1966, Affiliated submitted for filing to the Division of Alcoholic Beverage Control its "Price and Discount Listings" for sale from wholesaler to retailer so that it might begin selling Schenley products to retailers immediately. Association objected to the filing because the regular quarterly filing date had passed. The Director rejected the filing.[1]

██ Prior to the next quarterly filing date, the Association's attorney drafted legislation to block Schenley and others from entering the wholesale to retail business. We need not recount the events leading up to the passage of

---

[1] The Director notified plaintiff of his intention to accept its next timely filing. There is some evidence that he had accepted late filings on other occasions. Plaintiff did not pursue its appeal from the Director's determination since the later passage of Chapter 58 would preclude eligibility even if a *successful* filing had been made on April 1, 1966.

the legislation here attacked. These events are extensively set forth in the trial court's opinion. See 106 *N. J. Super.* at 461–470. It is enough to say that the Association sponsored and solicited support for the enactment of the legislation. As the trial judge correctly pointed out, however, the interest of the Association and its role in the passage of the legislation do not render the statute invalid if there is also a public need coupled with a reasonable attempt to satisfy that need. *Id.* at 470; *Independent Electricians & Electrical Contractors' Association et al. v. New Jersey Board of Examiners of Electrical Contractors,* 48 *N. J.* 413, 420-21 (1967). While the events preceding the enactment of this legislation impel us to examine it with a more critical eye, we must nonetheless determine, as in any other case of this nature, whether the legislation fulfills a public need. And in so determining, it must be remembered that because of its inherent evils liquor has always been dealt with as a subject apart. *Borough of Fanwood v. Rocco,* 33 *N. J.* 404 (1960); *Paul v. Gloucester County,* 50 *N. J. L.* 585, 595 (E. & A. 1888). Its sale may be prohibited entirely or severely curtailed. *Borough of Fanwood v. Rocco, supra* 33 *N. J.* at 411. While the constitutional protections of equal protection and due process are applicable to actions arising in this area, these protections must be viewed in the light of the broad power of the Legislature to regulate the sale of intoxicating beverages. Indeed, that power has been called "practically limitless." *Blanck v. Mayor and Borough Council of Magnolia,* 38 *N. J.* 484, 490 (1962); *Meehan v. Excise Commissioners,* 73 *N. J. L.* 382, 386 (Sup. Ct. 1906), aff'd 75 *N. J. L.* 557 (E. & A. 1908).

Chapter 58 (with the new language italicized) provides in pertinent part:

It shall be unlawful for any owner, part owner, stockholder or officer or director of any corporation, or any other person whatsoever interested in any way whatsoever in any brewery, winery, distillery or rectifying and blending plant, or any wholesaler of alcoholic bever-

ages, to conduct, own either in whole or in part, or be directly or indirectly interested in the retailing of any alcoholic beverages . . . .

\*        \*        \*        \*        \*        \*        \*        \*

*It shall be unlawful for any owner, part owner, stockholder or officer or director of any corporation, or any other person or corpora-tion whatsoever interested in any way whatsoever in any winery, distillery, or rectifying and blending plant, to conduct, own either whole or in part, or be directly or indirectly interested in the busi-ness of any licensee for the sale at wholesale to licensed retailers in New Jersey of any alcoholic beverages, other than malt alcoholic beverages, and such interest shall include any payments or delivery of money or property by way of loan or otherwise accompanied by an agreement to sell the product of said winery, distillery or rectifying and blending plant; except that the foregoing shall not apply in the case of a licensee for the sale at wholesale who on July 1, 1965, and thereafter until the effective date of this act, shall have filed for publication by the Division of Alcoholic Beverage Control price list-ings for brands of alcoholic beverages pursuant to the rules and regulations of the Division of Alcoholic Beverage Control.*

It shall be unlawful for any owner, part owner, stockholder or officer or director of any corporation, or any other person whatsoever, interested in any way whatsoever in the retailing of alcoholic bev-erages to conduct, own either in whole or in part, or to be a share-holder, officer or director of a corporation or association, directly or indirectly, interested in any brewery, winery, distillery, rectifying and blending plant, or wholesaling or importing interests of any kind what-soever outside of the State.

\*        \*        \*        \*        \*        \*        \*        \*

*It shall be unlawful for any owner, part owner, stockholder or officer or director of any corporation, or any other person or corpora-tion whatsoever interested in any way whatsoever in the wholesaling of alcoholic beverages, other than malt alcoholic beverages, to own either in whole or in part, or to be a stockholder, officer or director of a corporation or association, directly or indirectly, interested in, any winery, distillery or rectifying and blending plant, or wholesaling or importing interests of any kind whatsoever outside of the State, unless such relationship with respect to such winery, distillery or rectifying and blending plant or wholesaling or importing interests of any kind whatsoever outside the State shall have been in existence on July 1, 1965 and shall have continued to be in effect on the effective date of this act. N. J. S. A. 33:1-43.*

## I

Plaintiff initially attacks the first amendatory paragraph of Chapter 58 as a denial of due process in that it bears no relation to the public health, safety or welfare. The

State answers this charge by asserting that the statute fosters temperance and helps stabilize the liquor industry. In order to determine whether the present legislation fulfills a public purpose, it is necessary to understand the overall approach which the Legislature has utilized to control the sales of alcoholic beverages. This approach can be characterized as a three-tiered distribution system of licensees — manufacturers, wholesalers, and retailers. The manufacturers hold Class A licenses, *N. J. S. A.* 33:1–10; the wholesalers hold Class B licenses, *N. J. S. A.* 33:1–11; and the retailers hold Class C licenses, *N. J. S. A.* 33:1–12. Basically, Chapter 58 precludes a manufacturer from wholesaling or from having any interest in wholesalers. Stated differently, it prevents so-called "tied houses" at the manufacturer to wholesaler level. Tied house legislation is not new to New Jersey. After Prohibition was terminated by the adoption of the twenty-first amendment, and control was returned to the states, the New Jersey Legislature retained a system of private operation but surrounded it with comprehensive safeguards to promote temperance and to eliminate abuses of the trade. *L.* 1933, *c.* 436; *N. J. S. A.* 33:1–1 *et seq.* Our Control Act expressly prohibited tied houses between retailers and wholesalers or manufacturers. *N. J. S. A.* 33:1–43. Chapter 58 amended that statute to extend the prohibition against tied houses to include the relationship between manufacturers and wholesalers. In other words, prior to the present amendment tied houses between manufacturers and wholesalers were still permitted, and by closing this gap, the Legislature has now made all tiers of the three-tiered system independent of the others.

Affiliated concedes that "there is ample historical and logical justification for legislative prohibition of tied-house relationships between distillers and retailers and between wholesalers and retailers" since "such tied-houses inevitably result in excessive sales stimulation at the retail level, creating a direct conflict with the promotion of temperance." Indeed, it would be difficult not to make such a concession

in view of the testimony of Affiliated's own expert and our prior opinion in *Grand Union Co. v. Sills,* 43 *N. J.* 390 (1964). In *Grand Union,* Justice Jacobs noted that tied houses "contributed to sales stimulations which ran counter to the goal of temperance." *Id.* at 398–399. Affiliated attempts to distinguish the present legislation by contending that it cannot affect temperance since it deals only with those stages of distribution which are remote from the consumer. The State and the Association, as *amicus curiae,* contend that tied houses between manufacturers and wholesalers will lead to instability of the market and will ultimately affect consumption patterns adversely. Underlying the tied house prohibition is the assumption that the retail market for alcoholic beverages is elastic and that price cutting, aggressive marketing techniques, and similar practices tend to increase consumption and threaten the legislative goal of temperance. We recognize that this view of the alcoholic beverage market is not free from dispute. A strong effort to show that the market was inelastic was made in *Grand Union v. Sills, supra,* and, in the present case, Affiliated's expert testified that in his opinion the market was "relatively inelastic," although it was affected to some degree by price changes. As was noted in *Grand Union,* however, legislation based on the premise of an elastic market is valid in the absence of more compelling evidence that the market is inelastic. 43 *N. J.* at 402–403. In *Grand Union,* Justice Jacobs wrote:

In fixing its policy the Legislature accepted widely held views as to sound liquor control. These include beliefs that the consumption of liquor is elastic rather than inelastic, that price cuttings and their advertisement, along with comparable practices, are undesirable in the liquor field as tending to stimulate consumption * * *

* * * * * * * *

In the absence of more compelling data, our Legislature remains at liberty to continue the course it has set for our State, and this is particularly so because its course has thus far soundly served the public interest. 43 *N. J.* at 402–403.

■ Thus, the question is narrowed to whether legislation prohibiting tied houses between manufacturers and wholesalers bears any reasonable relationship to the legislative policies of temperance and stability of the market in an elastic market. We think it does. Despite Affiliated's statement that it presently does not intend to cut prices, there can be no assurances that it will not do so in the future. Affiliated contends that it cannot cut prices because each level of distribution must be self-sufficient and the trial court agreed. 106 *N. J. Super.* 474. It seems to us that tied houses between manufacturers and wholesalers are not so remote from the ultimate consumer that increased sales could not result. Affiliated and its expert concede that the retail market can be affected by "excessive sales stimulation." While it may be true that each tier must operate on a self-sufficient basis, there is no compulsion that each tier must operate at a profit. And if profits at the wholesale level are as "enormous" as Affiliated asserts, we cannot see why it cannot make significant cuts in its prices to retailers by reducing its profit or eliminating it altogether. Such a practice would be to the mutual benefit of both retailers and Schenley since they could split the profit which Affiliated declined to make. In other words, if Affiliated had a potential profit of one dollar a bottle at current prices, it could give 50¢ to Schenley and 50¢ to retailers. Retailers would then make extra efforts to sell Schenley products and increase their own profits. In so doing they might resort to the "excessive sales stimulation" practices which plaintiff concedes are at odds with the legislative goal of temperance. Moreover, our decisions have indicated that the Legislature also intended to insure that the alcoholic beverage industry remain stable. *Grand Union v. Sills, supra* 43 *N. J.* at 404. Price cutting practices at any tier affect the stability of the market. If Affiliated could operate as an arm of Schenley without a profit or at a small profit, other wholesalers would be unable to compete in sales of Schenley products to retailers. At the same time, sales stimulation

at the retail level (due to a retailer's larger profit on Schenley products) would result in a larger share of the market for Schenley. The result would be to decrease the business of all other wholesalers, and perhaps drive any marginal operators out of business altogether. Indeed, if Schenley were free to pursue this course of action, all other major manufacturers could enter the wholesaler to retailer market and thus compound the problems which Schenley alone could cause. While all of the above may seem a remote possibility, we cannot say that the Legislature was not free to act until these potential practices became a reality. The Legislature need not wait until evils have become flagrant and the State's liquor control policy has been impaired. *Grand Union v. Sills, supra* at 408. See also *Murphy v. California,* 225 *U. S.* 623, 629, 32 *S. Ct.* 697, 56 *L. Ed.* 1229, 1232 (1911).

Plaintiff contends that it cannot cut prices because of certain powers of price regulation which are vested in the Director. *N. J. S. A.* 33:1–93 gives him the power to promulgate rules and regulations on the "maintenance and publication of invoice prices, discounts, rebates, free goods, allowances and other inducements." Our cases have held that the Director has broad powers in fixing liquor prices and in promulgating price regulations. *E. g., Gaine v. Burnett,* 122 *N. J. L.* 39 (Sup. Ct.), aff'd 123 *N. J. L.* 317 (E. & A. 1939). These powers are discretionary, however, and the Legislature is free to enact prophylactic measures to insure against the possibility of price cutting.

Finally, we note that many other states have statutes prohibiting tied houses between manufacturers and wholesalers. *E. g., Deerings Cal. Codes, Bus. & Prof.* Ch. 5, Art. 1 § 23772; *Kan. Stat. Ann.* Ch. 41, Art. 7 § 704; *Ky. Rev. Stat.* Vol. 2 § 243.110; *Tenn. Code Ann.* Vol. 10A § 57–140; *Wis. Stat. Ann.* Vol. 21 § 176.05(5a).

We are satisfied that the first amendatory paragraph of Chapter 58 is not violative of due process. Nor do we believe that there is any merit to Affiliated's contention that

the paragraph is violative of equal protection in discriminating between those wholesalers which are tied to manufacturers and those wholesalers which are independent. For the reasons previously expressed, we believe there is a rational basis for this difference in treatment.

## II

Affiiliated contends that even if the first amendatory paragraph of Chapter 58 is valid, it should still be able to deal with retailers since it is protected by the following grandfather clause which is included in the paragraph:

* * * the foregoing shall not apply in the case of a licensee for the sale at wholesale who on July 1, 1965, and thereafter until the effective date of this act, shall have filed for publication by the Division of Alcoholic Beverage Control price listings for brands of alcoholic beverages pursuant to the rules and regulations of the Division of Alcoholic Beverage Control.

We think that the trial judge's finding that Affiliated was not protected by this clause, 106 *N. J. Super.* at 489–490 was correct and should not be disturbed.

## III

■ Affiliated contends that if the grandfather clause does not apply to it, the clause is invalid because it irrationally limited the chapter's effect to Schenley-Affiliated and was thus special legislation and constituted a denial of equal protection. The State answers that Schenley-Affiliated was the only major distiller planning wholesale activities and the Legislature attacked the evil where it was most felt. The trial judge agreed with Affiliated and held that the grandfather clause was invalid even if the rest of the legislation were "otherwise valid." 106 *N. J. Super.* at 482–488. The effect of the grandfather clause was to create three classes of wholesalers: 1) those who are not now and never have been connected with manufacturers; 2) those

who are connected with manufacturers, who had filed whole-sale to retail price lists prior to July 1, 1965, and who have continued to file such lists; and 3) Affiliated which had made its plans and all necessary investments, and which had filed a price list which was rejected by the Director.

There are two general rationales for upholding grand-father clauses. The first is that past business experience or practical training is a substantial equivalent of any licensing or examination requirement which might validly be imposed on a new entry into a trade. *Independent Electricians and Elec. Contractors' Ass'n v. N. J. Bd. of Examiners,* 54 *N. J.* 466 (1969). This rationale has no relevance here since we are not dealing with a skill and since the statute pro-hibits any later entries into the field. The second rationale is that when an initial regulatory scheme is adopted, exist-ing businesses must sometimes be preserved in order to satisfy the dictates of fairness and avoid hardships. *United States v. Maher,* 307 *U. S.* 148, 153, 59 *S. Ct.* 768, 83 *L. Ed.* 1162, 1167 (1939); *Commonwealth Air Transport v. Stuart,* 303 *Ky.* 69, 196 *S. W.* 2d 866 (1946). In the pres-ent case, the State does not dispute that Affiliated and Schenley had the proper license (for which they paid a sub-stantial annual fee) and had made the investments necessary to commence sales to retailers. But they were precluded from engaging in such sales by the grandfather clause's back-dated filing requirements. Thus, if the Legislature sought to pro-tect investments, it failed to afford the protection of the grandfather clause to all of those who had licenses and who made the necessary investments. This unequal treat-ment would be an invidious discrimination sufficient to invalidate the clause if its basis was solely the preservation of existing businesses. But defendants and *amicus curiae* contend that the discrimination is not invidious because the clause operates to make a rational distinction based on the size of the manufacturers. They argue that the handful of manufacturers who had, prior to the cutoff date, sold directly to retailers and who would otherwise be barred by Chapter

58 from continuing such method of distribution, hold a relatively small share of the market and do not pose a threat to the stability of the industry. Schenley, on the other hand, is one of the four largest national distillers, and the Legislature sought to prevent a threat to the stability of the industry where it was most felt.

The grandfather clause does not contain any language which would indicate that size was a factor considered by the Legislature. Nevertheless, if size does form a valid basis for the clause, we would, of course, uphold it. We are not, however, satisfied that size was the motivating factor because the clause does not deal in the slightest with the share of the market held by a manufacturer-wholesaler combination. Moreover, there is nothing in the clause to withdraw its protection in the event that a presently protected combination increases its share of the market. Nor is there anything to prohibit a protected small manufacturer-wholesaler combination from being acquired by a major manufacturer. Finally, if small combinations in general pose no threat to the stability of the market, there is no reason why future combinations with a small share of the market are barred. But the entire basis of the defendants' argument is that manufacturer-wholesaler combinations are a serious threat to the industry. If this threat is as serious as defendants contend, perhaps any grandfather clause would be invalid whether drawn in terms of either protecting investment or of size. See *Zullo v. Board of Health, Woodbridge Tp.,* 9 *N. J.* 431, 440 (1952). But we need not pursue this point. It is clear that the present legislation did not protect existing investments. Nor did it deal with the problems of size. Thus, we conclude that the discrimination the clause permits is invidious and violates equal protection.

IV

Having decided that the grandfather clause is invalid, we must still determine whether that clause can be

severed from the remainder of the statute. Affiliated contends that it cannot. Severability is a question of legislative intent. *Angermeier v. Borough of Sea Girt*, 27 *N. J.* 298, 311 (1958). The governing principle is whether it can be fairly concluded that the Legislature designed the statute to stand or fall as a unitary whole. In reaching this conclusion, we must determine whether the objectionable feature can be excised without substantial impairment of the principal object of the statute. *N. J. Chapt., Am. I. P. v. N. J. State Bd. of Prof. Planners*, 48 *N. J.* 581, 593 (1967). An entire statute will not be invalidated when one clause is found to be unconstitutional unless that clause is so intimately interconnected with the whole that it can be reasonably said that the Legislature would not have enacted the statute without the offending clause. *Ahto v. Weaver*, 39 *N. J.* 418, 427 (1963). In the present case, the principal object of the first amendatory paragraph of Chapter 58 is the prohibition of tied houses between manufacturers and wholesalers. That object will not be impaired by the invalidation of the included grandfather clause which, in creating an exception, is at odds with the clear purpose of the statute. "Ordinarily if a part of a statute is adjudged invalid and the remainder can stand independently without conflict with the overall basic purpose of the Legislature, it will be allowed to do so." *N. J. Chapt., Am. I. P. v. N. J. State Bd. of Prof. Planners, supra* 48 *N. J.* at 593. See also *N. J. S. A.* 1:1–10. In these circumstances, we think that the invalid grandfather clause contained in the first amendatory paragraph of Chapter 58 is severable from the main body of the statute and does not invalidate the whole statute.

## V

Finally, Affiliated attacks the second amendatory paragraph of Chapter 58 and all of Chapter 59 of the Laws of 1966. *N. J. S. A.* 33:1–93.6. The trial judge found it unnecessary to determine the validity of these sections because

he was unable to see how they conflicted with Affilidated's activities. 106 *N. J. Super.* at 488–490. We agree with the trial judge on this point.

## VI

For the foregoing reasons, the judgment of the Chancery Division declaring the first amendatory paragraph of Chapter 58 of the Laws of 1966 invalid, is reversed insofar as it holds the main body of the paragraph unconstitutional. We affirm, however, the judgment of unconstitutionality of the grandfather clause and further hold that that clause is severable from the remainder of the paragraph. The judgment is in all other respects affirmed.

Affirmed in part and reversed in part. No costs.

*For affirmance in part and reversal in part*—Justices PROCTOR, HALL, SCHETTINO and HANEMAN and Judge GOLDMANN—5.