830 F.2d 957
 ACTMEDIA, INC., a Delaware corporation, Plaintiff-Appellant,
v.
Jay STROH, as Director of the Alcoholic Beverage Control
Board; and the Department of Alcoholic Beverage
Control, Defendants-Appellees
 No. 84-5994
 United States Court of Appeals, Ninth Circuit
 Argued and Submitted March 5, 1985
Decided May 12, 1986
 
 James E. Merriman, Pacific Palisades, Cal., for plaintiff-appellant.
 Martin H. Milas, Deputy Atty. Gen., Los Angeles, Cal., for defendants-appellees.
 Appeal from the United States District Court for the Central District of California.
 Before GOODWIN, FLETCHER, and PREGERSON, Circuit Judges.
 FLETCHER, Circuit Judge:
 
 
 1
 Actmedia, Inc., a corporation whose business consists of leasing advertising space on supermarket shopping carts, appeals from the district court's judgment, following trial, dismissing Actmedia's declaratory and injunctive action against the California Department of Alcoholic Beverage Control ("ABC") and its director. Actmedia maintains that ABC erroneously interpreted section 25503(h) of the California Business and Professions Code, which forbids manufacturers and distributors of alcoholic beverages from paying retail establishments to advertise their products, as prohibiting these groups from using Actmedia's advertising displays. Actmedia further maintains that if ABC's interpretation of section 25503(h) is correct, the statute constitutes an impermissible restriction on commercial speech under the United States and California Constitutions.
 
 
 2
 We have jurisdiction under 28 U.S.C. Sec. 1291 (1982). We conclude that the eleventh amendment to the United States constitution, U.S. Const. amend. XI, bars Actmedia's action against ABC, and bars its claims against ABC's director based upon the wording of section 25503(h) and the California Constitution. We further conclude that section 25503(h) does not impermissibly burden Actmedia's right to engage in commercial speech under the first amendment to the United States Constitution, U.S. Const. amend. I. We therefore affirm the district court's decision.
 
 FACTUAL BACKGROUND
 A. The Actmedia Advertising Program
 
 3
 Actmedia is a publicly-owned company that contracts with supermarket chains for the right to display advertising on over 460,000 shopping carts throughout the United States. It leases these rights in 3300 stores operated by seventy different retail food chains, including thirteen of the fifteen supermarket chains with the largest dollar-volume of sales in the nation, such as Safeway, Albertson's, A & P, Grand Union, and Ralph's. Actmedia operates in a total of fifty-two cities and metropolitan areas, and in California, it operates in the Los Angeles, San Francisco, and San Diego metropolitan areas.
 
 
 4
 Once it has leased the right to display advertising on various stores' shopping carts, Actmedia sublets the space to product manufacturers directly or through their advertising agencies. The manufacturers then typically provide a series of eight-and-one-half inch by eleven-inch four-color displays, usually of their products' graphics or slogans, which are mounted like miniature billboards on the inside and outside of the front ends of the shopping carts. Actmedia places up to twelve noncompeting advertisements in each supermarket, and since there are two product-displays per shopping cart, each advertisement appears on one-sixth of the shopping carts in each supermarket. Actmedia's field service staff of 150 full-time and 400 part-time employees install and maintain the displays; the advertisements run for four-week cycles. Actmedia's customers include twenty-one of the nation's twenty-five largest advertisers of consumer packaged goods, such as Bristol-Myers and H.J. Heinz (which accounted for 11.1% and 10.2%, respectively, of the company's revenues in 1982), and such other companies as Proctor and Gamble, General Mills, General Foods, Nestle, Cheeseborough Ponds, Scott Paper, Kimberly Clark, and L'Eggs.
 
 
 5
 Actmedia charges advertisers based upon the number of cash-register transactions in each store for the regions where their advertisements are appearing. It pays participating supermarkets 25% of a proportional share of Actmedia's gross billings cash-register transactions, minus any advertising agency commissions it has been charged. Actmedia charges precisely the same advertising rates and makes the same 25% payment to supermarkets, regardless of the type of products being advertised. Ultimately, Actmedia retains about 75% of the revenues it receives from advertisers.
 
 B. Cal.Bus. & Prof.Code Sec. 25503(h)
 
 6
 Section 25503(h) of the California Business and Professions Code provides that:
 
 
 7
 No manufacturer, winegrower, manufacturer's agent, California winegrower's agent, rectifier, distiller, bottler, importer or wholesaler, or any officer, director, or agent of any such person, shall ... Pay money or give or furnish anything of value for the privilege of placing or painting a sign or advertisement, or window display, on or in any premises selling alcoholic beverages at retail.
 
 
 8
 Cal.Bus. & Prof.Code Sec. 25503(h) (West 1985) (emphasis added).
 
 
 9
 The provision was enacted in 1935, shortly after the repeal of the eighteenth amendment and the end of Prohibition, as part of California's "tied-house" statutes, so named because they were intended to prevent the return of saloons operated by liquor manufacturers, which had been prevalent in the early 1900's.[1] The California legislature enacted these statutes for two main purposes: (1) to prevent large-scale manufacturers and wholesalers of alcoholic beverages from dominating local markets for their products through vertical and horizontal integration; and (2) to promote and curb "excessive sales of alcoholic beverages" by prohibiting the "overly aggressive marketing techniques" that had been characteristic of large-scale alcoholic beverage concerns. California Beer Wholesalers Association, Inc. v. Alcoholic Beverage Control Appeals Board, 5 Cal.3d 402, 407, 487 P.2d 745, 96 Cal.Rptr. 297 (1971); see Schenley Affiliated Brands Corp. v. Kirby, 21 Cal.App.3d 177, 182-83 & n. 2, 186, 190, 98 Cal.Rptr. 609 (1971); Allied Properties Department of Alcoholic Beverage Control, 53 Cal.2d 141, 147-151, 346 P.2d 737, 740-42 (1959); see also United States v. Department of Commerce, State Liquor Legislation 20 (1941).
 
 
 10
 The California legislature's underlying philosophy in adopting the tied-house statutes was to establish a "triple-tiered distribution and licensing scheme" that would keep the manufacturers, wholesalers, and retailers of alcoholic beverages separate from one another and would prevent vertical or horizontal integration. California Beer Wholesalers Association, 5 Cal.3d at 407-09 & n. 8, 487 P.2d 745, 96 Cal.Rptr. 297.
 
 
 11
 The legislature was responding to what it perceived at the time as "an inability on the part of small retailers to cope with pressures exerted by larger manufacturing or wholesale interests." Id. at 407, 487 P.2d 745, 96 Cal.Rptr. 297. By prohibiting integration of retail and wholesale outlets for alcoholic beverages and by preventing wholesalers and manufacturers from extending credit to retailers or otherwise gaining economic influence over them, the legislature sought to prevent the emergence of exclusive dealing arrangements in the alcoholic beverage industry that could lead to an overabundance of retail outlets, the imposition of quotas on retailers by individual manufacturers or wholesalers, and forms of unfair competition that would further disrupt the structure of the industry and create "disorderly marketing conditions."[2]
 
 
 12
 In attempting to prevent alcoholic beverage manufacturers and wholesalers from exerting control over retailers and from imposing quotas upon them, and to prevent a proliferation of retail outlets for alcoholic beverages, the legislature also intended to minimize the use of aggressive marketing techniques and drastic price-cutting in the alcoholic beverage industry, and thereby to promote the goal of temperance. See California Beer Wholesalers Association, 5 Cal.3d at 407-08 & n. 7, 487 P.2d 745, 96 Cal.Rptr. 297 (" 'Underlying the tied-house prohibition is the assumption that the retail market for alcoholic beverages is elastic and that price-cutting, aggressive marketing techniques, and similar practices tend to increase consumption and threaten the legislative goal of temperance.' ") (quoting Affiliated Distillers Brands Corp. v. Sills, 56 N.J. 251, 265 A.2d 809, 813 (1970)); Allied Properties, 53 Cal.2d at 148, 346 P.2d at 741 (tied-house statutes further the goal of temperance, "because the elimination at the retail level of price cutting, bargain sales, and advertising of low prices [that the statutes accomplish,] tends to reduce excessive purchases of alcoholic beverages"). The legislature expressly declared in 1935 that it was enacting the Alcoholic Beverage Control Act, of which section 25503(h) was a part, "to eliminate the evils of unlicensed and unlawful manufacture, selling, and disposing of alcoholic beverages, and to promote temperance in the use and consumption of alcoholic beverages." Cal.Bus. & Prof.Code Sec. 23001 (West 1985); see also Cal.Bus. & Prof.Code Sec. 24749 (adopted in 1961 and declaring that "[i]t is the declared policy of the State that it is necessary to regulate and control the manufacture, sale, and distribution of alcoholic beverages within this State for the purpose of fostering and promoting temperance in their consumption....") (West 1985). Like other legislators throughout the United States who endorsed tied-house statutes in the 1930's, many of the drafters of section 25503(h) presumably believed that "the tied house tended to increase consumption of alcohol," and that its elimination would therefore promote temperance. National Distributing Co., 626 F.2d at 1009 (referring specifically to the federal tied-house statute), accord H.R.Rep. No. 1542 at 12 (complaining of a "forced increase in alcoholic beverage sales resulting from the 'tied-house' "); 79 Cong.Rec. 11797 (remarks of Congressman Lewis that without a tied-house statute, brewers or distillers would require retailers to purchase a certain quota of their brands, and "[t]he temptation [would be] irresistible for the retailer to induce [his] customers to buy drinks when they had already had quite enough"); see also 79 Cong.Rec. 11789 (statement of Congressman Connery); Federal Alcohol Control Act: Hearings on H.R. 8870 Before the Senate Comm. on Finance, 74th Cong., 1st Sess. 119, 122 (1935). Thus, section 25503(h) was enacted by the California legislature both to help ensure that retailers in the alcoholic beverage industry remained independent of manufacturers and wholesalers in that industry and to promote temperance.
 
 
 13
 C. Coors' Use of Actmedia's Advertising Program
 
 
 14
 Beginning in April, 1981, Actmedia provided its advertising services to The Adolph Coors Company ("Coors"), displaying eight-and-a-half-inch by eleven-inch Coors beer advertisements on shopping carts in Ralph's and Albertson's supermarkets in the Los Angeles metropolitan area. In September, 1981, Coors contracted with Actmedia to place Coors beer advertisements in all of Actmedia's Los Angeles and San Francisco supermarkets during the first seven four-week cycles of 1982. The total contract price was $359,337. The parties agree that the Coors advertisements placed in supermarkets by Actmedia during 1981-1982 were both truthful and related to lawful activity.
 
 
 15
 In June, 1982, ABC made a determination that Coors had violated section 25503(h), because "by and through its agency, Actmedia, Inc., [Coors] pa[id] money for the privilege of placing a sign or advertisement in ... premises selling alcoholic beverages at retail." ABC issued a formal accusation against Coors and notified Coors that its violation constituted grounds for suppression or revocation of its California beer and wine importers general license. In April 1983, ABC and Coors entered into an agreement whereby Coors paid a fine in lieu of a ten-day suspension of its license. Immediately after being cited by ABC, Coors terminated its use of the Actmedia program, and did not pay the $250,000 balance remaining on its contract.
 
 
 16
 Actmedia then brought this action in federal court for declaratory and injunctive relief and for money damages against ABC and its director, Jay Stroh. Actmedia asserted that Coors's use of Actmedia's advertising program did not violate section 25503(h), and that if it did, section 25503(h) violates the "free speech" clauses of the California Constitution and the first amendment to the United States Constitution.
 
 
 17
 D. The Potential Effects of the Actmedia Program on Coors and Other Alcoholic-Beverage Producers
 
 
 18
 The parties stipulated into evidence a set of results from a 1977 study of consumer purchasing tendencies at supermarkets that had been prepared jointly by the Point of Purchase Institute, the E.I. Dupont Company, and fifty national advertisers. The study concluded that supermarket customers make 64.8% of their decisions concerning which brand of product to purchase once they are already in the supermarket. For alcoholic beverages, this percentage is 67%: 61% for beer, 74.7% for wine, and 81.2% for spirits. The study also concluded that display advertising increases the number of customers purchasing the advertised brand 6 times for beer, 13 times for wine, and 39 times for hard liquor.
 
 
 19
 The parties stipulated, based upon a market study conducted for Coors in the Los Angeles area, that use of the Actmedia program by Coors resulted in a 6% increase in the sales volume of its beer at participating supermarkets, at the expense of reduced purchases of other brands. This may have been attributable in part to the direct impact on consumers of the Actmedia advertising, but the record suggests that it may also have been partly attributable to preferential treatment that Coors received from supermarket operators because of its use of Actmedia. Since supermarket operators benefit financially from the Actmedia program, they have a vested interest in providing special benefits and free promotions for those products advertising with Actmedia: if Actmedia's advertising services are seen as a surefire method of promoting products, Actmedia's gross billings, and, thus, supermarket operators' percentage share of those billings will increase. As a result, the record suggests that Coors may have received advantages in displaying its product while advertising with Actmedia, such as being assigned better locations within various supermarkets' beer display coolers or better locations for floor displays.
 
 
 20
 Neither the district court nor the company performing the market study for Coors specifically concluded that Coors's use of the Actmedia program increased the overall consumption of alcoholic beverages. Coor's gains all appear to have come at the expense of competing brands of beer. The record indicates that at present, the leading seller of beer in California is Anheuser-Busch, which includes the brands of Budweiser, Michelob, Bud Light, and Natural Light, and which sells about 50% of the beer in the state. Coors is the second largest seller with 14% of total sales, and Miller is third with 12%. California supermarkets each sell an average of about 30 different brands of beer. During 1983, a total of 22 million barrels of beer were sold in the state.
 
 E. The District Court's Decision
 
 21
 Following trial, the district court entered judgment for ABC and its director, Stroh. The district court concluded that Coors violated section 25503(h) by using the Actmedia program. It also concluded that Section 25503(h) satisfies the four-part test for restrictions on commercial speech enunciated by the United States Supreme Court in Central Hudson Gas & Electric v. Public Service Commission, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), and therefore does not violate either the United States or California Constitutions. Finally, the court concluded that section 25503(h) does not deny Actmedia equal protection under either constitution.[3]
 
 ANALYSIS
 
 22
 Actmedia contends that in prohibiting Coors from using its advertising services, ABC and its director, Stroh, incorrectly applied section 25503(h), and violated article I, section 2 of the California Constitution and the first amendment to the United States Constitution. We conclude that the eleventh amendment prohibits this court and prohibited the district court from addressing any of Actmedia's claims against ABC, and from addressing Actmedia's state statutory and state constitutional claims against Stroh. We further conclude that because the restrictions imposed upon Actmedia and Coors under section 25503(h) satisfy the four-part test for the regulation of commercial speech announced by the United States Supreme Court in Central Hudson, the district court correctly rejected Actmedia's first amendment claim against Stroh.
 
 A. Standard of Review
 
 23
 We review de novo the district court's determinations concerning issues of constitutional law, including the validity of Actmedia's first amendment claim and the defendants' eleventh and twenty-first amendment defenses. See Christian Science Reading Room Jointly Maintained v. City and County of San Francisco, 784 F.2d 1010, 1012 (9th Cir.1986); LaDuke v. Nelson, 762 F.2d 1318, 1322 (9th Cir.1985); United States v. McConney, 728 F.2d 1195, 1201-03 (9th Cir.) (en banc) (citing Ellwest Stereo Theaters, Inc. v. Wenner, 681 F.2d 1243 (9th Cir.1982)), cert. denied, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). We also review de novo the district court's determinations on other questions of law, including issues relating to subject-matter jurisdiction and the proper interpretation of various statutory provisions. See Sample v. Johnson, 771 F.2d 1335, 1338 (9th Cir.1985) (subject matter jurisdiction); them, the legislature sought to prevent the emergence of exclusive dealing arrangements in the alcoholic beverage industry that could lead to an fact under the "clearly erroneous" standard. See LaDuke, 762 F.2d at 1321.
 
 B. Actmedia's Claims Against ABC
 
 24
 All of Actmedia's claims against ABC are jurisdictionally barred by the eleventh amendment,[4] regardless of the nature of relief they seek, because ABC is a state agency, and neither California nor the United States Congress has provided consent or authorization for ABC to be sued in federal court. See Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 100-01, 104 S.Ct. 900, 907-09, 79 L.Ed.2d 67 (1984); accord Almond Hill School v. United States Department of Agriculture, 768 F.2d 1030, 1034-35 (9th Cir.1985); see also Atascadero State Hospital v. Scanlon, 473 U.S. 234, 105 S.Ct. 3142, 3145-48, 87 L.Ed.2d 171 (1985); Price v. Hawaii, 764 F.2d 623, 629 (9th Cir.1985). Thus, the district court lacked subject-matter jurisdiction over all Actmedia's claims against ABC, and should not have addressed the merits of those claims. See Almond Hill School, 768 F.2d at 1034-35.
 
 
 25
 The pretrial order relied upon by Actmedia does not include an "unequivocal," "express," or clearly implied waiver of California's eleventh-amendment immunity. The order indicates merely that ABC admitted the underlying facts that would have been necessary to establish federal jurisdiction over Actmedia's claims, not that it waived its eleventh-amendment immunity. ABC expressly asserted an eleventh-amendment defense to all Actmedia's claims in its answer to the complaint, and there is nothing in the record to suggest that it ever withdrew this defense. The order relied upon by Actmedia expressly refers to ABC's eleventh-amendment claim, and suggests that the district court did not regard this claim to have been withdrawn or waived.[6] Since California never waived its eleventh-amendment immunity in this action, the district court should have dismissed all Actmedia's claims against ABC for lack of subject matter jurisdiction.
 
 
 26
 C. Actmedia's State Statutory and State Constitutional Claims Against Stroh
 
 
 27
 Actmedia's claims against ABC's Director, Stroh, based upon the wording of section 25503(h) and the California Constitution, are also barred by the eleventh amendment, in light of the principles recently announced by the Supreme Court in Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). The Supreme Court held in Pennhurst that "a federal suit against state officials on the basis of state law contravenes the Eleventh Amendment when ... the relief sought and ordered has an impact directly on the State itself." Id. at 117, 104 S.Ct. at 917; accord Smith v. Robinson, 468 U.S. 992, 104 S.Ct. 3457, 3464 n. 6, 82 L.Ed.2d 746 (1984); Deak-Perera Hawaii, Inc. v. Department of Transportation, 745 F.2d 1281, 1283 (9th Cir.1984), cert. denied, 470 U.S. 1053, 105 S.Ct. 1756, 84 L.Ed.2d 820 (1985); Kollsman v. City of Los Angeles, 737 F.2d 830, 836 n. 18 (9th Cir.1984), cert. denied, 469 U.S. 1211, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985); see Pennhurst, 465 U.S. at 106, 104 S.Ct. at 911 (holding that the exceptions to the eleventh amendment recognized in Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), and Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) for suits brought against state officials are not applicable to suits based on alleged violations of state law, or designed to compel state officials "to conform their conduct to state law," because such suits "do[ ] not vindicate the supreme authority of federal law," and do produce "great[ ] intrusion[s] on state sovereignty," and therefore would undermine "the principles of federalism that underlie the Eleventh Amendment"). Since resolution of Actmedia's state statutory and state constitutional claims against Stroh will directly affect the way that California enforces section 25503(h), we conclude that federal courts are barred from addressing these claims by the eleventh amendment.[7] See Pennhurst, 465 U.S. at 101 & n. 11, 117, 104 S.Ct. at 911 (" 'relief sought nominally against an officer is in fact against the sovereign if the decree would operate against the latter.' ") (quoting Hawaii v. Gordon, 373 U.S. 57, 58, 83 S.Ct. 1052, 1053, 10 L.Ed.2d 191 (1963) (per curiam)); Demery v. Kupperman, 735 F.2d 1139, 1145-46 (9th Cir.1984) (citing Gordon, 373 U.S. at 58, 83 S.Ct. at 1053), cert. denied, 469 U.S. 1127, 105 S.Ct. 810, 83 L.Ed.2d 803 (1985).
 
 
 28
 Actmedia contends that the eleventh amendment does not bar its state-law claims against Stroh, because Stroh acted "in excess of his authority," and therefore did not qualify to assert an eleventh-amendment defense. This precise argument was raised by the dissent in Pennhurst, 465 U.S. at 153-59, 104 S.Ct. at 936-39 (Stevens, J., dissenting), and was expressly rejected in the majority opinion. See id. at 106-17, 104 S.Ct. at 911-17. Therefore, we must reject it here. We conclude that the district court lacked subject-matter jurisdiction over Actmedia's statutory and state constitutional claims against Stroh, and accordingly, should have dismissed those claims along with Actmedia's claims against ABC. See id. at 124-25, 104 S.Ct. at 921.
 
 
 29
 D. Actmedia's First-Amendment Claim Against Stroh
 
 
 30
 Actmedia's only claim that is not jurisdictionally barred by the eleventh amendment is its first-amendment claim against Stroh.[8] Actmedia contends that by prohibiting Coors from employing the Actmedia advertising program based upon section 25503(h), Stroh and his subordinates violated Actmedia's (and presumably, Coors's) right to engage in commercial speech guaranteed by the first amendment.
 
 
 31
 Actmedia asserts that in evaluating its first-amendment challenge, we must apply the four-part analysis for assessing the validity of restrictions on commercial speech that is provided in Central Hudson. It maintains that under the Central Hudson analysis, we must conclude that Stroh's application of section 25503(h) in the present case violated Actmedia's first-amendment rights. The district court applied the Central Hudson analysis, but found no first-amendment violation. Although Stroh maintains that we should apply a more deferential standard in reviewing his conduct than that provided in Central Hudson, we conclude that even under the Central Hudson analysis, Stroh's application of section 25503(h) to the Actmedia program did not violate the first amendment.
 
 
 32
 1. The Appropriate Standard for Evaluating Actmedia's First-Amendment Claims
 
 
 33
 As a threshold matter, the parties disagree concerning the standard to be applied in evaluating Actmedia's first-amendment claim against Stroh. Actmedia maintains that because it is claiming that Stroh's application of section 25503(h) directly infringed upon its rights to advertise products within retail stores, we must review section 25503(h) simply as a restriction upon commercial speech, and we must therefore apply Central Hudson's four-part analysis. See Zauderer v. Office of Disciplinary Counsel, 471 U.S. 626, 105 S.Ct. 2265, 2275, 85 L.Ed.2d 652 (1985) (suggesting that "advertising pure and simple ... falls within th[e] bounds [of commercial speech]," and therefore, restrictions on advertising must be reviewed under the Central Hudson analysis); see also Bolger v. Youngs Drug Products Corp., 463 U.S. 60, 66-68, 103 S.Ct. 2875, 2880-81, 77 L.Ed.2d 469 (1983). To apply the Central Hudson analysis,
 
 
 34
 [f]irst, we determine whether the expression is constitutionally protected. For commercial speech to receive such protection, "it at least must concern lawful activity and not be misleading." ... Second, we ask whether the governmental interest is substantial. If so, we must then determine whether the regulation directly advances the government interest asserted, and whether it is not more extensive than necessary to serve that interest.
 
 
 35
 Bolger, 463 U.S. at 68-69, 103 S.Ct. 2880-81 (quoting Central Hudson, 447 U.S. at 566, 100 S.Ct. at 2351); accord Zauderer, 105 S.Ct. at 2275; Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 507, 101 S.Ct. 2882, 2892, 69 L.Ed.2d 800 (1981).
 
 
 36
 2. Reviewing Section 25503(h) Under the Central Hudson Analysis
 
 
 37
 Applying Central Hudson's four-part analysis in the present case, we conclude that Stroh's application of section 25503(h) to Actmedia's advertising program did not violate the first amendment. We note initially that there is little dispute concerning the first two factors of the Central Hudson analysis. First, the parties have stipulated that the Coors ads displayed by Actmedia and proscribed by Stroh "concern lawful activity and [are] not ... misleading." Thus, they constitute protected commercial speech under the first amendment. See Bolger, 463 U.S. at 68, 103 S.Ct. at 2881 (citing Central Hudson, 447 U.S. at 566, 100 S.Ct. at 2351). Second, there is little question that California has a "substantial" interest in exercising its twenty-first amendment powers and regulating the structure of the alcoholic beverage industry in California: the activities of manufacturers, wholesalers, and retailers in the state; the methods by which alcoholic beverages are marketed; and influences that affect the consumption levels of alcoholic beverages by California residents. See California Beer Wholesalers Association, 5 Cal.3d at 407, 487 P.2d 745, 96 Cal.Rptr. 297; U.S. Const. amend. XXI; see also Bolger, 463 U.S. at 68-69, 103 S.Ct. at 2881-82.
 
 
 38
 Thus, the resolution of Actmedia's first-amendment challenge turns on the final two factors of the Central Hudson analysis: "whether [section 25503(h) ] directly advances the government interests that it is asserted [to advance], and whether it is not more extensive than necessary to serve [those] interest[s]." Bolger, 463 U.S. at 69. We conclude that section 25503(h) furthers California's purposes both of limiting the ability of large alcoholic-beverage manufacturers and wholesalers to achieve vertical and horizontal integration by acquiring influences over the state's retail outlets, and of promoting temperance among the state's residents. See California Beer Wholesalers Association, 5 Cal.3d at 407, 487 P.2d 745, 96 Cal.Rptr. 297. We also conclude that the provision is not broader than necessary to achieve these purposes. Therefore, we conclude that section 25503(h) satisfies the Central Hudson test and does not violate the first amendment.
 
 
 39
 a. Direct Advancement of California's Interests
 
 
 40
 Like other tied-house statutes passed in the 1930's, section 25503(h) is primarily designed to prevent or limit a specific evil: the achievement of dominance or undue influence by alcoholic beverage manufacturers and wholesalers over retail establishments. See id.; Cal.Bus. & Prof.Code Sec. 25503(a)-(e), (g) (prohibiting manufacturers and wholesalers from making gifts to retailers or their employees; providing them with free goods, goods on consignment, or free decorations; paying them secret rebates; or discriminating in their prices between different retailers). As noted above, the drafters of the provision were concerned that this type of dominance would tend to produce an undesirable industry and market structure, and could indirectly lead to increased consumption of alcoholic beverages. See Factual Background, Section B, supra. The drafters believed that if manufacturers and wholesalers were permitted to gain influence through economic means over various retail establishments, they would inevitably attempt to use that influence to obtain preferential treatment for their products and either exclusion of or less favorable treatment for the brands of their competitors. The alliances that developed between manufacturers and wholesalers and various retailers would presumably often develop into exclusive dealing arrangements, and retail establishments offering wide varieties of brands of alcoholic beverages would largely be replaced by outlets selling only one brand or a limited number of brands. The drafters of the tied-house laws feared that this would lead to a proliferation of retail liquor outlets and the establishment of quotas for individual retailers, and would create insurmountable barriers to entry for brands that could not outbid large scale manufacturers and wholesalers for the preferential treatment of retailers.
 
 
 41
 Moreover, the drafters of the tied-house laws were concerned that the establishment of quotas for retailers and the need to justify the advertising fees they were being paid would create incentives for retailers to be far more aggressive in encouraging their customers to purchase the alcoholic beverages they stocked. They feared that the increased aggressiveness on the part of retailers, combined with the already "overly aggressive marketing techniques" of the large concerns who would pay to advertise in retail outlets, California Beer Wholesalers Association, 5 Cal.3d at 407, 487 P.2d 745, 96 Cal.Rptr. 297, and the proliferation of retail liquor establishments that was expected, would increase consumption of alcoholic beverages.
 
 
 42
 By prohibiting alcoholic beverage manufacturers and wholesalers from paying retailers for advertising within their establishments, section 25503(h) was designed to eliminate the possibility that such payments could be used by large-scale operators to purchase favored treatment for their products by individual retailers, or even exclusion of their products' competing brands. Since California's other tied-house laws explicitly prohibited alcoholic beverage manufacturers and wholesalers from making gifts, paying rebates, or otherwise "buying" the favor of retailers and their employees, see, e.g., Cal.Bus. & Prof.Code Sec. 25503(a)-(e), section 25503(h) was designed to prevent manufacturers and wholesalers from circumventing these other tied-house restrictions by claiming that the illegal payments they made to retailers were for "advertising." The concern that advertising payments could be used to conceal illegal payoffs to alcoholic beverage retailers appears to have been widely held at the time of section 25503(h)'s enactment, see, e.g., 27 U.S.C. Sec. 205(b)(4) (federal tied-house provisions proscribing similar, if not identical conduct to section 25503(h)), and we "hesitate to disagree with the accumulated, common-sense judgments of [the] lawmakers" who originally enacted the provision or who have retained it in effect. Metromedia, 453 U.S. at 509, 101 S.Ct. 2882.
 
 
 43
 Because prohibiting alcoholic-beverage manufacturers and wholesalers from paying retailers to advertise in their stores will eliminate any danger that such payments will be used to conceal illegal payoffs and violations of the tied-house laws, we conclude that section 25503(h) furthers the same interests that led California to enact the tied-house laws. By flatly proscribing such payments, California minimized the possibility that alcoholic-beverage manufacturers and wholesalers will obtain undue influence over retail establishments, resulting in increased vertical and horizontal integration of California's liquor industry. By reducing the possibility that such integration will occur, along with such side effects as a proliferation of retail liquor establishments and the emergence of quotas for individual outlets, section 25503(h) also operates indirectly to promote temperance. Moreover, in reducing the quantity of advertising that is seen in retail establishments selling alcoholic beverages, the provision also directly furthers California's interest in promoting temperance. Therefore, we conclude that section 25503(h) directly advances California's interests in preventing vertical and horizontal integration of the alcoholic beverage industry and promoting temperance.
 
 
 44
 b. Narrowness of Section 25503(h)
 
 
 45
 Finally, we conclude that section 25503(h) is no more extensive than necessary to serve the purposes for which it was enacted. See Bolger, 463 U.S. at 69, 103 S.Ct. at 2881. As noted above, one purpose of the statute was to prevent illegal payments from being channelled by alcoholic-beverage manufacturers and wholesalers to retailers. Arguably, this purpose could be achieved in the absence of section 25503(h) by careful policing of any advertising agreements made between retailers and manufacturers or wholesalers. However, it would be impossible for an agency like ABC to determine whether an advertising company had paid an inordinately high price to a retailer or to investigate whether a retailer had in fact provided more than merely advertising services. Moreover, such policing duties could well lead an agency like ABC to interfere in the advertising process, thus creating other potential first amendment problems. Thus, section 25503(h)'s blanket prohibition of paid advertising in retail establishments appears to be as narrowly drawn as possible to effectuate California's first purpose.
 
 
 46
 California's second purpose for enacting section 25503(h) was to promote temperance, both indirectly, by limiting vertical integration of the alcoholic-beverage industry and its side effects, and directly, by reducing the amount of point-of-purchase advertising. As noted above, section 25503(h) may well be the narrowest means of limiting illegal payments to liquor retailers. Moreover, to the extent that the California legislature has determined that point-of-purchase advertising is a direct cause of excessive alcohol consumption, limiting that advertising is "obviously the most direct and perhaps the only effective approach" available. Metromedia, 453 U.S. at 508, 101 S.Ct. at 2892-93.
 
 
 47
 We emphasize the narrowness of section 25503(h)'s scope. It prohibits only paid advertising in retail stores, not unpaid advertising in those stores or paid advertising anywhere else. For all these reasons, we conclude that section 25503(h) is no broader than necessary to achieve its purposes. We therefore conclude that the provision satisfies the Central Hudson test, and does not violate the first amendment.
 
 CONCLUSION
 
 48
 Since the eleventh amendment bars all of Actmedia's claims against ABC and its statutory and state constitutional claims against Stroh, we vacate the district court's judgment insofar as it applies to these claims, and remand this action to the district court for entry of an order dismissing these claims based upon lack of subject matter jurisdiction. See Pennhurst, 465 U.S. at 124-25, 104 S.Ct. at 921-22; Almond Hill School, 768 F.2d at 1034-35, 1039. Because the application of section 25503(h) at issue in this case satisfies the four-part Central Hudson test, we affirm the district court's decision rejecting Actmedia's first-amendment claim against Stroh.
 
 
 49
 AFFIRMED in part, VACATED in part and REMANDED.
 
 
 
 [1]
 Following the repeal of the eighteenth amendment, the "vast majority of states" enacted alcohol beverage control laws, like California's "tied-house" statutes, that were designed "to forestall the generation of such evils and excesses as intemperance and disorderly marketing conditions [which] had plagued the public and the alcoholic beverage industry prior to prohibition." California Beer Wholesalers Assoc., Inc. v. Alcoholic Beverage Control Appeals Board, 5 Cal.3d 402, 407, 487 P.2d 745, 96 Cal.Rptr. 297 (1971); see United States Department of Commerce, State Liquor Legislation 20 (1941). Congress enacted a federal tied-house provision in 1935 as part of the Federal Alcohol Administration Act, 27 U.S.C. Secs. 201-212 (1982), that was designed to serve essentially the same purposes. See H.R.Rep. No. 1542, 74th Cong., 1st Sess. 3, 5-12 (1935); S.Rep. No. 1215, 74th Cong., 1st Sess. 2, 6-7; 79th Cong.Rec. 11717, 11795-97, 14569 (1935); National Distributing Co. v. United States Treasury Department, Bureau of Alcohol, Tobacco and Firearms, 626 F.2d 997, 1004-10 (D.C.Cir.1980); see generally Stein Distributing Co. v. Department of Treasury Bureau of Alcohol, Tobacco and Firearms, 779 F.2d 1407, 1410-12 (9th Cir.1986) (applying federal tied-house provision); Wine Industry of Florida, Inc. v. Miller, 609 F.2d 1167, 1170-72 (5th Cir.1980) (same); Castlewood International Corp. v. Simon, 596 F.2d 638, 640-43 (5th Cir.1979) (same)
 It is perhaps worth noting that the federal tied-house provision, 27 U.S.C. Sec. 205(b) (1982), is similar to Cal.Bus. & Prof.Code Sec. 25503(h), and might well proscribe the type of conduct at issue in this case. Section 205(b)(4), for example, makes it unlawful for any alcohol producer or wholesaler "[t]o induce ... any retailer ... to purchase any ... products from such person to the exclusion [of other products] ... by paying ... the retailer for any advertising, display, or distribution service...." 27 U.S.C. Sec. 205(b)(4).
 
 
 [2]
 During the 1930's, legislators throughout the United States criticized the industry structure that tied-house arrangements created. These arrangements were blamed for producing monopolies and exclusive dealing arrangements, for causing a vast growth in the number of saloons and bars, for fostering commercial bribery, and for generating other "serious social and political evils," including political corruption, irresponsible ownership of retail outlets, and intemperance. S.Rep. No. 1215, 74th Cong., 1st Sess. 2, 6-7 (1935) (relating to federal tied-house provision); Federal Alcohol Control Act: Hearings on H.R. 8539 Before the House Comm. on Ways and Means, 74th Cong., 1st Sess. 10 (1935); Federal Alcohol Control Act: Hearings on H.R. 8870 Before the Senate Comm. on Finance, 74th Cong., 1st Sess. 119 (1935); 79 Cong.Rec. 14569 (1935); National Distributing Co., 626 F.2d at 1008-10. According to one sponsor of the federal tied-house statute, the use of tied-house arrangements was "one of the great reasons that [had] brought on prohibition." 79 Cong.Rec. 11717 (remarks of Congressman Treadway)
 
 
 [3]
 Actmedia has not raised its equal protection claims in this appeal, and we therefore need not review the district court's decision on equal protection
 
 
 [4]
 The eleventh amendment provides that:
 The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.
 Actmedia contends that California and ABC waived the state's eleventh-amendment immunity in the present case, based upon a particular pretrial order issued by the district court. The test for finding waiver by a state of its eleventh-amendment immunity is "stringent." Scanlon, 105 S.Ct. at 3147. The waiver or "consent [must] be unequivocally expressed," Pennhurst, 465 U.S. at 99, 104 S.Ct. at 907, and must be "stated 'by the most express language or by such overwhelming implications from [a written] text as [will] leave no room for any other reasonable construction.' "[5] Edelman v. Jordan, 415 U.S. 651, 673, 94 S.Ct. 1347, 1361, 39 L.Ed.2d 662 (1974) (quoting Murray v. Wilson Distilling Co., 213 U.S. 151, 171, 29 S.Ct. 458, 464, 53 L.Ed. 742 (1909)); accord Price, 764 F.2d at 629.
 
 
 [5]
 For example, the fact that California's Constitution expressly waives the state's sovereign immunity in general terms is not sufficient to waive the state's eleventh-amendment immunity from suit in federal court, although it is sufficient to subject California to suit in its own courts. See Scanlon, 105 S.Ct. at 3147 (discussing Cal. Const. art. III, Sec. 5 and stating that "[i]n the absence of an unequivocal waiver specifically applicable to federal court jurisdiction, we decline to find that California has waived its constitutional immunity"); Pennhurst, 465 U.S. at 99-100 & n. 9, 104 S.Ct. at 907 n. 9
 
 
 [6]
 The pretrial order refers to ABC's eleventh-amendment defense specifically in the context of Actmedia's claims for money damages, but, as noted above, ABC's eleventh-amendment immunity extends to all claims against it, regardless of the nature of the relief sought. See Pennhurst, 465 U.S. at 100-01, 104 S.Ct. at 907-08; Almond Hill School, 768 F.2d at 1034-35
 
 
 [7]
 The fact that Actmedia's claims against Stroh under section 25503(h) and the California Constitution are pendent to its first-amendment claim against Stroh does not avoid the jurisdictional bar of the eleventh amendment for these claims. County of Oneida v. Oneida Indian Nation, 470 U.S. 226, 105 S.Ct. 1245, 1260, 84 L.Ed.2d 169 (1985); Pennhurst, 465 U.S. at 121, 104 S.Ct. at 919. The Supreme Court has held that "[a] federal court must examine each claim in a case to see if the court's jurisdiction over that claim is barred by the Eleventh Amendment." Pennhurst, 465 U.S. at 121, 104 S.Ct. at 919
 
 
 [8]
 Because Actmedia's first-amendment claim against Stroh involves a challenge under the federal constitution to the actions of a state official, it may be brought in federal court under the exception to the eleventh amendment provided by Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). See Pennhurst, 465 U.S. at 102-03, 104 S.Ct. at 909-10; accord Demery v. Kupperman, 735 F.2d 1139, 1146-50 (9th Cir.1984), cert. denied, 469 U.S. 1127, 105 S.Ct. 810, 83 L.Ed.2d 803 (1985)