Filed 8/29/24  In re A.R.R. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re A.R.R. et al.,<br><br>Persons Coming Under the Juvenile Court Law. | B331448<br><br>(Los Angeles County<br> Super. Ct. No. 19CCJP02617A-D) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>D.L. and E.A.,<br><br>    Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Marguerite D. Downing, Judge.  Affirmed in part, Conditionally Reversed in part and Remanded.

Jacob I. Olson, by appointment of the Court of Appeal, for Defendant and Appellant D.L.

Patricia K. Saucier, by appointment of the Court of Appeal, for Defendant and Appellant E.A.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Veronica Randazzo, Deputy County Counsel, for Plaintiff and Respondent.

**INTRODUCTION**

Dora L. (mother) and Eduardo A. (father) appeal the orders terminating their parental rights under Welfare and Institutions Code section 366.26.[1]  Mother argues the trial court erred in failing to apply the parental-benefit exception under section 366.26, subdivision (c)(1)(B)(i).  Father contends the Los Angeles County Department of Children and Family Services (the Department) failed to comply with the inquiry requirements under the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.) and related California statutes (§ 224 et seq.).  We find the juvenile court did not err in declining to apply the parental-benefit exception.  However, we conditionally reverse the juvenile court's orders terminating parental rights and remand to the juvenile court with instructions to comply with ICWA's inquiry requirements.

Mother also appeals the juvenile court's orders denying her petitions for modification under section 388.  We affirm.

As the parties are familiar with the facts and procedural history of the case, we do not restate those details in full here.  Below, we discuss only the facts and history as needed to resolve—and provide context for—the issues presented on appeal.

---

[1]     All further statutory references are to the Welfare and Institutions Code unless otherwise specified.

2

## RELEVANT BACKGROUND

Mother and father have four children together: twins Aaliyah and Ishbel (born in June 2017), Jayden (born in Jan. 2019), and Adrian (born in Jan. 2021).

The family originally came to the attention of the Department in 2019 because of domestic violence between mother and father, leading to the filing of a section 300 petition. In May 2019, the juvenile court sustained the allegations of the petition, removed Aaliyah, Ishbel, and Jayden from father's care, and placed them with mother. In January 2020, the children were removed from mother's care after another incident of domestic violence between father and mother. The court also issued a three-year restraining order protecting mother from father until February 24, 2023. The restraining order required father to stay 100 yards away from mother and prohibited father from contacting mother either directly or indirectly. The juvenile court returned the children to mother's care in August 2020.

In January 2021, while the restraining order was in effect, mother had another child with father (Adrian). In March 2021, the Department filed a section 300 petition alleging Adrian was at risk, in part, because of the parents' history of domestic violence in the presence of their children. The petition was sustained in May 2021, and the juvenile court removed Adrian from father and placed him with mother. Mother was also ordered to enforce the restraining order protecting her from father.

On August 9, 2021, the Department received an immediate response referral when both parents and all four children were found together in an alleyway in unsanitary conditions. In response, the Department filed a supplemental petition under section 387, alleging the prior disposition had

3

not been effective in protecting the children. On August 23, 2021, the children were detained from mother and placed with caregivers.

In July 2022, the juvenile court terminated reunification services for mother, in part because she failed to enforce the restraining order against father. On May 2, 2023, mother filed a petition under section 388 seeking to have the children returned to her care or reunification services reinstated. The juvenile court summarily denied the petition. On October 16, 2023, mother filed a second section 388 petition, seeking the same relief. The juvenile court denied mother's second petition on December 13, 2023.

On December 21, 2023, the juvenile court terminated mother and father's parental rights and designated the children's caregivers as their prospective adoptive parents.

## DISCUSSION

### I.   *Section 388 Petitions*

Mother appeals the denials of her May 2023 and October 2023 section 388 petitions.

### A.   *Legal Standards*

Section 388 allows a parent to petition to change, modify, or set aside any previous juvenile court order. (§ 388, subd. (a).) "To obtain an evidentiary hearing on a section 388 petition, a parent must make a prima facie showing that circumstances have changed since the prior court order, and that the proposed change will be in the best interests of the child. [Citations.]" (*In re Alayah J.* (2017) 9 Cal.App.5th 469, 478.) The parent petitioning under section 388 has the burden of establishing both prongs by a preponderance of the evidence. (*In re J.M.* (2020) 50 Cal.App.5th 833, 845.)

4

"To support a section 388 petition, the change in circumstances must be substantial." (*In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223.) A petition that only shows changing—not changed—circumstances is insufficient to require an evidentiary hearing. (*Ibid.*; *In re Baby Boy L.* (1994) 24 Cal.App.4th 596, 610.) The petition should also explain "'the reason the change was not made before.'" (*In re D.R.* (2011) 193 Cal.App.4th 1494, 1512.) The fact that the parent "makes relatively last-minute (albeit genuine) changes" does not automatically tip the scale in the parent's favor. (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 530 (*Kimberly F.*).)

"It is not enough for a parent to show *just* a genuine change of circumstances under the statute. The parent must show that the undoing of the prior order would be in the best interests of the child. [Citation.]" (*Kimberly F.*, *supra*, 56 Cal.App.4th at p. 529.) "When custody continues over a significant period, the child's need for continuity and stability assumes an increasingly important role." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 464.) "After the termination of reunification services, a parent's interest in the care, custody and companionship of the child is no longer paramount. [Citation.] Rather, at this point, the focus shifts to the needs of the child for permanency and stability." (*Ibid.*) "While the bond to the caretaker cannot be dispositive . . . , our Supreme Court made it very clear in *Jasmon O.* that the disruption of an existing psychological bond between dependent children and their *caretakers* is an extremely important factor bearing on any section 388 motion." (*Kimberly F.*, *supra*, 56 Cal.App.4th at p. 531, citing *In re Jasmon O.* (1994) 8 Cal.4th 398, 408, 414–422.) For a parent "to revive the reunification issue," the parent must prove that circumstances have changed such that reunification is in the child's best interest. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.)

"In determining whether [a § 388] petition makes the required showing, the court may consider the entire factual and procedural history of the case." (*In re K.L.* (2016) 248 Cal.App.4th 52, 62.) A section 388 petition may not be based on a parent's conclusory assertions. (*In re Anthony W.* (2001) 87 Cal.App.4th 246, 250.)

"We normally review the grant or denial of a section 388 petition for an abuse of discretion." (*In re Alayah J.*, *supra*, 9 Cal.App.5th at p. 478.) "A court exceeds the limits of legal discretion if its determination is arbitrary, capricious or patently absurd. The appropriate test is whether the court exceeded the bounds of reason." (*In re L.W.* (2019) 32 Cal.App.5th 840, 851, citing *In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319.)

B.      *Mother has Forfeited Any Challenge to the Denial of her Initial Section 388 Petition*

While mother has appealed the denial of both of her petitions under section 388, mother offers no argument suggesting the juvenile court abused its discretion in denying her initial May 2023 petition. Instead, mother's arguments on appeal are limited to the denial of her second section 388 petition.

"When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as [forfeited]." (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784–785; see also *People v. Smith* (2003) 30 Cal.4th 581, 616, fn. 8 ["We need not consider . . . a perfunctory assertion unaccompanied by supporting argument"]; *Department of Alcoholic Beverage Control v. Alcoholic Beverage Control Appeals Bd.* (2002) 100 Cal.App.4th 1066, 1078; *Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852.) We conclude mother has

forfeited any argument that the juvenile court erred in denying her May 2023 petition. Accordingly, we affirm the court's June 21, 2023, orders denying her initial section 388 petition.

C.     *The Trial Court Did Not Abuse its Discretion in Denying Mother's Second Section 388 Petition*

Mother argues she carried her burden under section 388 to establish a change in circumstances. Mother primarily relies on reports submitted by individuals retained by her counsel, specifically social worker investigator Danielle Lujan (Lujan) and psychologist Dr. Ronald W. Banks (Dr. Banks). Lujan reported that she observed two visits between mother and the children in 2023. Lujan noted mother brought appropriate food, toys, and crafts to the visits. The report also indicated the children were happy to see mother and expressed love and affection for her. During those visits, mother was actively engaged with the children, established rules, and offered appropriate positive reinforcement.

Dr. Banks conducted a bonding study based on his observation of one of mother's visits with the children. Dr. Banks reported that mother demonstrated warmth toward the children, actively played with them and set appropriate limits. She was attentive and responded to their verbal and non-verbal cues. Based on his observation, Dr. Banks determined that mother demonstrated a positive bond with the children and the "parent/child attachment appeared to be secure."

Mother also argues she completed courses on parenting, domestic violence, and individual counseling, and that her therapist reported growth in relevant areas.

Mother contends this evidence supported a finding that her circumstances had changed and that placing the children with her was in their best interest. But, there was also considerable evidence in the record supporting the court's decision.

For example, there was evidence that mother repeatedly placed the children's safety at risk while in her care. On October 16, 2023, the same day she filed her second petition, mother brought a knife with her to a visit with the children. Mother allowed Jayden to gain access to the knife and play with it. This led to a cut on Adrian's finger, which mother tried to hide from the caregiver. When mother admitted Adrian had been cut by her knife, the caregiver bandaged his cut and took him to the emergency room for medical treatment. The Department reported that mother appeared to minimize the significance of the injury and was not remorseful.

This was not an isolated lapse in judgment as there are numerous reports of mother being inattentive during visits and placing the children at risk of harm. Mother also repeatedly failed to bring diapers and wipes to change Adrian during visits and ignored Adrian whenever he needed his diaper changed. Because of mother's inattentiveness, the caregiver was forced to step in during mother's visits to change Adrian's diapers.

The Department also reported that when mother was unaware that a Department social worker was watching, she let the children do whatever they wanted. The Department's reports indicate that the children often did not follow mother's directives and that mother was unable to set or enforce rules. The Department social worker observing mother's visits also noted that "most of the time [during mother's visits], the responsibility to care for the minors and tend to their needs lies with the caregiver" and not with mother.

There was also evidence in the record suggesting that mother and father remained in a romantic relationship. Mother has denied being in a relationship with father, yet in February 2022, mother and father were seen arriving to a visit together. Mother also accidentally sent a text message to the Department social worker from father's phone confirming her upcoming visit with the children. In May 2023, both parents were seen arriving together in the same car to a school event. Aaliyah and Ishbel also reported that the parents expressed their love for each other on video calls in the children's presence. The children said they were told to keep that a secret.

On appeal, mother focuses almost exclusively on the evidence that supports her petition. While mother acknowledges the reports that she was often distracted by her phone during visits with the children, she implies that we can disregard this evidence because the reports were contradicted by Lujan and Dr. Banks. This conflicting evidence does not establish that the juvenile court abused its discretion by crediting the reports of the Department and caregiver over those of Lujan and Dr. Banks. "The existence of evidence supporting mother's position does not demonstrate that the juvenile court abused its discretion. Our role is not to substitute our judgment for that of the juvenile court or reweigh the evidence. "'"'The appropriate test for abuse of discretion is whether the [juvenile] court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.'"'" [Citation.]" (*In re J.P.* (2019) 37 Cal.App.5th 1111, 1123; accord *In re N.C.* (2019) 39 Cal.App.5th 81, 87 ["conflicting evidence . . . does not render the juvenile court's commitment order an abuse of discretion or warrant its reversal"].)

On this record, we conclude the juvenile court did not abuse its discretion in denying mother's petition.  We affirm the juvenile court's denial of mother's second petition under section 388.

II.    *Parental-Benefit Exception*

Mother contends the juvenile court erred in not applying the parental-benefit exception under section 366.26, subdivision (c)(1)(B)(i) when terminating her parental rights.

A.    *Legal Standards*

Section 366.26's express purpose is "to provide stable, permanent homes" for dependent children.  (§ 366.26, subd. (b).)  If the juvenile court has decided to end reunification services, adoption is the legislative preference. (§ 366.26, subd. (b)(1); see also *In re Celine R.* (2003) 31 Cal.4th 45, 53 ["'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker'"]) Thus, once the juvenile court finds the child is adoptable, "the court must order adoption and its necessary consequence, termination of parental rights," unless a parent can establish one of the exceptions set forth in section 366.26, subdivision (c).  (*In re Celine R., supra*, 31 Cal.4th at p. 53; see also § 366.26, subd. (c)(1);  *In re Caden C.* (2021) 11 Cal.5th 614, 624 (*Caden C.*).)

The specified circumstances in section 366.26, subdivision (c)(1)(B) are "*exceptions* to the general rule that the court must choose adoption where possible."  (*In re Celine R., supra*, 31 Cal.4th at p. 53.)  "At this stage of the dependency proceedings, 'it becomes inimical to the interests of the minor to heavily burden efforts to place the child in a permanent alternative home.' [Citation.]  The statutory exceptions merely permit the court, in *exceptional*

10

circumstances [citation], to choose an option other than the norm, which remains adoption." (*Ibid.*; see also *In re A.L.* (2022) 73 Cal.App.5th 1131, 1150.)

The exception at issue here is the parental-benefit exception, which permits the selection of another permanent plan if "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) In *Caden C., supra*, 11 Cal.5th at page 631, our Supreme Court "discern[ed] three elements the parent must prove" to establish the parental-benefit exception under section 366.26, subdivision (c)(1)(B)(i).

First, the parent must show "regular visitation and contact with the child, taking into account the extent of visitation permitted." (*Caden C., supra*, 11 Cal.5th at p. 636.) This element is "straightforward," involving an assessment of whether the parent visits consistently. (*Id.* at p. 632.)

Second, the parent must show that "the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C., supra*, 11 Cal.5th at p. 636.) In making this determination, "the focus is the child. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*Id.* at p. 632.) Thus, "courts often consider how children feel about, interact with, look to, or talk about their parents." (*Ibid.*)

For the third element, the parent must show that terminating the parent-child attachment "would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden*

11

*C., supra*, 11 Cal.5th at p. 636.)  Under this factor, the court must determine "how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life."  (*Id.* at p. 633.)  This evaluation consists of a "subtle, case-specific inquiry[,]" including consideration of whether "the benefit of placement in a new, adoptive home" outweighs the harm the child "'would experience from the loss of [a] significant, positive, emotional relationship'" with the parent.  (*Ibid.*)  The juvenile court does "not look to whether the parent can provide a home for the child," and "is not comparing the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)."  (*Id.* at p. 634.)

We review the court's finding on the second element for substantial evidence.  (*Caden C., supra*, 11 Cal.5th at pp. 639–640.)  We review the court's finding on the third element for abuse of discretion.  (*Id.* at pp. 640–641.)  At no point may we substitute our own judgment for that of the trial court.  (*Id.* at p. 641.)

B.      *Substantial Evidence Supports the Juvenile Court's Ruling*

On December 21, 2023, the juvenile court ruled the parental-benefit exception did not apply and terminated mother's parental rights.  The court noted it had considered the *Caden C.* factors and found mother did not carry her burden on the second factor as she "has not established a bond with the child."  The court also held mother had not satisfied the third *Caden C.* factor concluding that, "any benefit accruing to the child from his/her relationship with the parent(s) is outweighed by the physical and emotional benefit the child will receive through the permanency and stability of adoption, and that adoption is in the best interests of the child."  The court also found "by clear

12

and convincing evidence that it would be detrimental to the child to be returned to the parents."

On appeal, there is no question that mother consistently visited the children and established the first *Caden C.* factor.

In arguing that she satisfied her burden of establishing a bond with the children, mother again focuses almost entirely on the favorable reports from Dr. Banks and Lujan. But the question is not whether there is substantial evidence in the record which would have supported the application of the exception, the question is whether there was substantial evidence in the record supporting the trial court's ruling. As above, mother simply ignores the majority of the contrary evidence on this point.

The record is replete with evidence that mother was inattentive during visits with the children, often to their detriment. The record contains numerous reports that mother showered the children with toys and junk food on visits instead of bonding with the children in a meaningful way. Reports from mother's visitation acknowledge that the children were happy to see her, but suggest that they viewed their time with mother as play time with no rules. Cumulatively, there is substantial evidence supporting the juvenile court's conclusion that the children did not have a substantial emotional attachment to mother under the second *Caden C.* factor.

Even if we were to find mother had met her burden under the second *Caden C.* factor, she has not established the juvenile court abused its discretion in finding the benefits of adoption outweighed any detriment caused by the termination of the parental relationship.

The record contains ample evidence of the immense benefit to the children of placement in a new adoptive home. The children all spent considerable portions of their lives with the prospective adoptive caregivers.

13

At the time of the section 366.26 hearing in December 2023, the children had been with the caregivers for over two years. For Adrian, who was seven months old at the time of placement, this represented most of his life. Jayden had spent approximately half his life with the caregivers. The twins, Aaliyah and Ishbel, had been with caregivers for approximately one-third of their lives.

Evidence indicated the children had acclimated to their placement with caregivers and thrived in their care. For example, in a June 2023 report, the Department found the children were making progress in their developmental goals and appeared comfortable and confident in the caregivers' home. While their speech skills were limited, both Aaliyah and Ishbel stated they wanted to stay in caregivers' home. The report also noted that the children had a strong bond with their caregivers.

Mother ignores the considerable benefits that adoption would provide for the children, and has thus failed to demonstrate the juvenile court abused its discretion in how it weighed these factors. On this record, we do not find any abuse of discretion in the juvenile court's determination that the benefits and security of adoption outweighed any detriment the children might experience from the termination of their relationship with mother. (*Caden C., supra*, 11 Cal.5th at p. 640; see also *In re Celine R., supra,* 31 Cal.4th at p. 53 ["'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker'"].)

We conclude the juvenile court did not err when it declined to apply the parental-benefit relationship exception to adoption under section 366.26, subdivision (c)(1)(B)(i).

III.   *ICWA*

Father argues the Department failed to comply with its duty of inquiry under ICWA because it "failed to conduct an inquiry with several available maternal and paternal extended family members regarding their Indian ancestry." Specifically, father contends the Department should have made ICWA inquiry to maternal grandmother and grandfather, maternal uncle, maternal aunts, and a maternal great-aunt, the paternal grandparents, and a paternal aunt.

A.   *Legal Standards*

Congress enacted ICWA "to promote the stability and security of Indian tribes and families by establishing minimum standards for removal of Indian children from their families and placement of such children 'in foster or adoptive homes which will reflect the unique values of Indian culture.'" (*In re Levi U.* (2000) 78 Cal.App.4th 191, 195; see also 25 U.S.C. § 1902.) "ICWA recognizes that "'the tribe has an interest in the child which is distinct from . . . the interest of the parents."'" (*Dwayne P. v. Superior Court* (2002) 103 Cal.App.4th 247, 253.)

Under state law, the juvenile court and the Department have "an affirmative and continuing duty to inquire whether a child for whom a petition under Section 300 . . . may be or has been filed, is or may be an Indian child."[2] (§ 224.2, subd. (a); see *In re Isaiah W.* (2016) 1 Cal.5th 1, 9,

---

[2]   An "Indian child" is a child who is either a member of an Indian tribe or is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe. (§ 224.1, subds. (a), (b); 25 U.S.C. § 1903(4).) "[B]ecause ICWA uses the term 'Indian,' we do the same for consistency, even though we recognize that other terms, such as 'Native American' or 'indigenous,' are preferred by many." (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 739, fn. 1.)

15

11–12.) "The continuing duty to inquire whether a child is or may be an Indian child 'can be divided into three phases: the initial duty to inquire, the duty of further inquiry, and the duty to provide formal ICWA notice.'" (*In re Y.W.* (2021) 70 Cal.App.5th 542, 552.)

The duty of initial inquiry includes, but is not limited to, "asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child." (§ 224.2, subd. (b).) "Extended family members" include persons defined by law or custom of the Indian child's tribe, or in the absence of law or custom, adults who are the child's "grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (§ 224.1, subd. (c); 25 U.S.C. § 1903(2).)

## B. *Conditional Remand is Required*

While this appeal was pending, our California Supreme Court published its opinion in *In re Dezi C.* (Aug. 19, 2024, S275578) __ Cal.5th __ [2024 WL 3853597] (*Dezi C.*), resolving a split of authority regarding whether and how to apply the prejudicial error standard in the context of deficiencies in the initial ICWA inquiry. Our Supreme Court rejected any application of the prejudicial error doctrine, finding "When a Cal-ICWA inquiry is inadequate, it is impossible to ascertain whether the agency's error is prejudicial." (*Dezi C.*, *supra*, __ Cal.5th __ [2024 WL 3853597 at p. *8].) Instead, the court set out a bright line rule under which "error resulting in an inadequate initial Cal-ICWA inquiry requires conditional reversal with directions for the child welfare agency to comply with the inquiry requirement of section 224.2, document its inquiry in compliance with rule

16

5.481(a)(5), and when necessary, comply with the notice provision of section 224.3." (*Ibid.*)

On appeal, the Department acknowledges it failed to ask various extended family members about their potential Native American heritage. The Department argues that this failure to inquire was harmless under the analysis set forth by our colleagues in the now-superseded *In re Dezi C.* (2022) 79 Cal.App.5th 769. As there is no question that the initial inquiry conducted by the Department was deficient, we must conditionally reverse the orders terminating parents' parental rights. (*Dezi C.*, *supra*, __ Cal.5th __ [2024 WL 3853597 at p. *19].)

## DISPOSITION

The orders denying mother's section 388 petitions are affirmed. The orders terminating parents' parental rights are conditionally reversed. The matter is remanded to the juvenile court with instructions to the Department and the juvenile court to comply with the inquiry, notice, and documentation requirements of ICWA. If the juvenile court finds an adequate further inquiry and due diligence has been conducted and concludes ICWA does not apply (§ 224.2, subd. (i)(2)), then the court shall reinstate the orders terminating parental rights.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


ZUKIN, J.

We concur:


CURREY, P. J.                    MORI, J.

17