[No. A096928. First Dist., Div. Four. Aug. 1, 2002.]

DEPARTMENT OF ALCOHOLIC BEVERAGE CONTROL, Petitioner, v. ALCOHOLIC BEVERAGE CONTROL APPEALS BOARD, Respondent; NORMAN C. DELEUZE et al., Real Parties in Interest.

COUNSEL

Bill Lockyer, Attorney General, Damon M. Connolly, Miguel A. Neri and Shari B. Posner, Deputy Attorneys General, for Petitioner.

No appearance for Respondent.

Pillsbury Winthrop, James M. Seff, J. Daniel Davis; Bartko, Zankel, Tarrant & Miller, William I. Edlund and Ramiz I. Rafeedie for Real Parties in Interest.

OPINION

**RIVERA, J.**—The Department of Alcoholic Beverage Control (Department) seeks an order of this court reinstating its determination that there is cause to suspend the license of Norman C. Deleuze and Rosa Lee Deleuze doing business as ZD Wines, a winegrower/supplier licensee (collectively ZD). The Department had issued a decision that ZD's payment for advertising in the exclusive sales catalog of an individual retail licensee violated the proscriptions of the "tied-house" laws. The Alcoholic Beverage Control

Appeals Board (Board) reversed the decision, finding that the Department's interpretation of the statute was too restrictive. We conclude that the Department's decision contains a reasoned interpretation and application of the alcoholic beverage control laws and, therefore, must be affirmed.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The facts in this matter are not in dispute. The parties submitted the following stipulated facts: "1. Norman C. de Leuze and Rosa Lee de Leuze doing business as ZD Wines ('[ZD]') hold a winegrower's license. [¶] 2. Mel-Jen, a California corporation doing business as Wally's ('Wally's'), holds an off-sale general retail license at 2107-09 Westwood Boulevard, Los Angeles, California. [¶] 3. George Rice & Sons ('George Rice') is a printer and holds no alcoholic beverage licenses. [¶] 4. George Rice contracted with Wally's to produce a holiday gift catalog ('Wally's catalog') in 1995 and 1996. [¶] 5. [ZD] paid George Rice $650 for a wine advertisement placed in the 1995 Wally's catalog and $750 for a wine advertisement placed in the 1996 Wally's catalog. [¶] 6. The Wally's catalogs contained exclusively products carried by Wally's. [¶] 7. The Wally's catalogs were distributed to over 125,000 customers in the Los Angeles area. [¶] 8. The Wally's catalogs contained Wally's phone number, fax number and address, information about the products and how to order them exclusively from Wally's. [¶] 9. In April 1996, George Rice placed $7,164.03 in Wally's US Postal Service Account." It was also undisputed that, but for payment by ZD and others, Wally's would have been required to pay George Rice & Sons for the cost of producing the catalog.

In August 1998 the Department filed an accusation against ZD, alleging two violations of Business and Professions Code[1] section 25502, subdivision (a)(2). The first count alleged that "[o]n or about August 11, 1995, [ZD] did furnish, give or lend money or other thing of value, directly or indirectly, to a person engaged in operating, owning or maintaining an off-sale licensed premises, to wit: a $650.00 payment to George Rice & Sons, Inc., for a wine product advertisement placed in a publication belonging to Mel Jen, a California corporation, [Wally's] who then and there held an off-sale general license, in violation of Section 25502(a)(2) of the California Business and Professions Code." The second count mirrored the allegations for a $750 payment made the following year. ZD filed a notice of defense pursuant to Government Code section 11506 and the matter was set for a hearing.

Following a one-day hearing the administrative law judge (ALJ) issued his proposed decision, in which he concluded that section 25502, subdivision

---

[1]Unless otherwise noted all statutory references are to the Business and Professions Code.

(a)(2) had been violated and that cause for suspension of ZD's license had been established. The ALJ found that payments by ZD to George Rice & Sons were indirect payments to Wally's, the sponsor of the catalogs and the only retail outlet mentioned in the two catalogs. The ALJ proposed that a fine of $10,000 be paid as an alternative to actual suspension of the license in accord with section 23095. The Department adopted the proposed decision.

ZD appealed the Department's decision to the Board. The Board reversed the decision of the Department. Conceding that "there is something to be said for the Department's arguments based on the 'tied house' legislation," the Board nonetheless was "not . . . convinced." Relying primarily on California Attorney General Opinion No. NS216 (Mar. 22, 1937) (hereafter 1937 opinion), the Board concluded that the interpretation the Department placed on the transactions at issue was "unreasonably restrictive."

We granted the Department's petition for a writ of review pursuant to section 23090.2.

## II. Discussion

■ The Department's primary contention is that the Board erred in reversing the Department's decision by substituting its interpretation of the Alcoholic Beverage Control Act (§ 23000 et seq.) (Act) for that of the Department's, thus exceeding its limited scope of review. We agree.

### A. *Standard of Review*

The administration of the Act, within its scope and purposes, is initially vested in the Department. (Cal. Const., art. XX, § 22; see also § 23000 et seq.) The Department's decisions are subject to administrative review by the Board. (§ 23084.) After the Board has issued a final order, the Department's decision is also subject to judicial review in the Supreme Court or the Court of Appeal. (§ 23090.2.)

■ The scope of review of both the Board and the courts is a narrow one. "The review by the board of a decision of the department shall be limited to the questions: [¶] (a) Whether the department has proceeded without, or in excess of, its jurisdiction. [¶] (b) Whether the department has proceeded in the manner required by law. [¶] (c) Whether the decision is supported by the findings. [¶] (d) Whether the findings are supported by substantial evidence in the light of the whole record. [¶] (e) Whether there is relevant evidence, which, in the exercise of reasonable diligence, could not

have been produced or which was improperly excluded at the hearing before the department." (§ 23084.)

Section 23090.2 directs the courts to review, not the Board's decision, but the Department's decision, addressing the same enumerated questions. The statute goes on to provide: "Nothing in this article shall permit the court to hold a trial de novo, to take evidence, or to exercise its independent judgment on the evidence." (*Ibid.*) Thus, in deciding the issues before us our role is limited to determining, based upon a review of "the whole record of the department," whether the *Department's* decision is subject to reversal on the grounds specified in section 23090.2.

 If the Department's administrative action declares or applies legal rules, or sets forth conclusions of law which are drawn from adjudicated or undisputed facts, it is subject to review only for insufficiency of the evidence, excess of jurisdiction, errors of law, or abuse of discretion. (*Boreta Enterprises, Inc. v. Department of Alcoholic Beverage Control* (1970) 2 Cal.3d 85, 95 [84 Cal.Rptr. 113, 465 P.2d 1].) " '[T]he discretion exercised by the Department . . . " 'is not absolute but must be exercised in accordance with the law, and the provision that it may revoke [or deny] a license "for good cause" necessarily implies that its decisions should be based on sufficient evidence and that it should not act arbitrarily in determining what is contrary to public welfare or morals.' " [Citations.] Nevertheless, *it is the Department, and not the Board or the courts, which must determine whether "good cause" exists for denying a license upon the ground that its issuance would be contrary to public welfare or morals.* [Citations.]' " (*Kirby v. Alcoholic Bev. etc. Appeals Bd.* (1973) 33 Cal.App.3d 732, 736-737 [109 Cal.Rptr. 291]; see also *Sepatis v. Alcoholic Bev. etc. Appeals Bd.* (1980) 110 Cal.App.3d 93, 102 [167 Cal.Rptr. 729] [if the Department's determination is a reasonable one, neither the Board nor the courts may substitute a contrary decision even if such decision would be equally or more reasonable].) Although most cases address the Department's discretionary powers in the context of the revocation, granting or denial of a license, the same deferential standard of review should and would apply to the Department's discretionary powers to determine whether there is good cause to suspend a license, since all of the powers derive from the same constitutional source. (Cal. Const., art. XX, § 22.)

We evaluate the decision of the Department in light of the jurisdiction of the Department and the legislative purposes of the Act.

B. *Jurisdiction of the Department*

The Department has been granted exclusive jurisdiction to "license the manufacture, importation and sale of alcoholic beverages in the State . . . ."

(Cal. Const., art. XX, § 22, par. 9.) The Department also has the power, "in its discretion, to deny, suspend or revoke any specific alcoholic beverages license if it shall determine for good cause that the granting or continuance of such license would be contrary to public welfare or morals, or that a person seeking or holding a license has violated any law prohibiting conduct involving moral turpitude." (*Ibid.*) ■ The discretion legally vested in an administrative body, such as the Department, is broad and inclusive and is not subject to judicial control when exercised within its legal limits. (*Walsh v. Kirby* (1974) 13 Cal.3d 95, 103 [118 Cal.Rptr. 1, 529 P.2d 33]; *Martin v. Alcoholic Bev. etc. Appeals Bd.* (1959) 52 Cal.2d 287, 295 [341 P.2d 296].) However, deference to the Department's interpretation of the Act is not unlimited. It is subject to review and intervention by the Board and the courts in the event that the Department acts in an arbitrary and capricious manner, or in a manner which is not in conformity with the spirit of the law. (*Walsh v. Kirby, supra,* 13 Cal.3d at p. 106.)

## C. *Background of Alcoholic Beverage Control Laws*

■ The legislative background of the alcoholic beverage control laws and of section 25502 was aptly summarized by the California Supreme Court in *California Beer Wholesalers Assn., Inc. v. Alcoholic Bev. etc. Appeals Bd.* (1971) 5 Cal.3d 402, 407-408 [96 Cal.Rptr. 297, 487 P.2d 745] (*California Beer Wholesalers*): "Following repeal of the Eighteenth Amendment, the vast majority of states, including California, enacted alcoholic beverage control laws. These statutes sought to forestall the generation of such evils and excesses as intemperance and disorderly marketing conditions that had plagued the public and the alcoholic beverage industry prior to prohibition. [Citations.] By enacting prohibitions against 'tied-house' arrangements, state legislatures aimed to prevent two particular dangers: the ability and potentiality of large firms to dominate local markets through vertical and horizontal integration [citation] and the excessive sales of alcoholic beverages produced by the overly aggressive marketing techniques of larger alcoholic beverage concerns [citations]. [¶] The principal method utilized by state legislatures to avoid these antisocial developments was the establishment of a triple-tiered distribution and licensing scheme. [Citations.] Manufacturing interests were to be separated from wholesale interests; wholesale interests were to be segregated from retail interests. In short, business endeavors engaged in the production, handling, and final sale of alcoholic beverages were to be kept 'distinct and apart.' [Citation.] [¶] . . . All levels of the alcoholic beverage industry were to remain segregated; firms operating at one level of distribution were to remain free from involvement in, or influence over, any other level." (Fn. omitted.) It is these legislative objectives that the tied-house provisions of California's alcoholic beverage control laws seek to effectuate.

D. *Department's Interpretation and Application of Section 25502, Subdivision (a)(2)*

Section 25502, one of the so-called tied-house laws, provides: "(a) No . . . winegrower, . . . California winegrower's agent, . . . or wholesaler . . . shall . . . : [¶] . . . [¶] (2) Furnish, give, or lend any money or other thing of value, directly or indirectly, to, or guarantee the repayment of any loan or the fulfillment of any financial obligation of, any person engaged in operating, owning, or maintaining any off-sale licensed premises." Based upon the stipulated facts presented, the Department concluded that all of the elements of section 25502, subdivision (a)(2) were present: ZD is a winegrower and a licensed supplier. Wally's is a licensed off-sale retailer. ZD furnished money to publisher George Rice & Sons to pay a portion of Wally's financial obligation to the publisher for the production of Wally's exclusive catalog. Therefore, ZD furnished to Wally's something of value in violation of the statute.

ZD challenges that determination. It argued below and argues here that section 25502, subdivision (a)(2) only prohibits gifts or other unilateral transfers from manufacturers or wholesalers to retailers and, therefore, this transaction is not a violation of the statute but only a straightforward purchase of advertising—a bilateral contract for which consideration was paid. Although this contention finds some support in the Attorney General's 1937 opinion, the Department concluded that ZD's interpretation of the statute "would place the Department in the impracticable position of having to examine transactions between winegrowers and licensed retailers to determine whether the transactions constituted fair value exchanges. . . . [¶] . . . [¶] To limit the reach of the statute's use of 'furnish' to unilateral contracts as urged by [ZD] would invite suppliers to engage in subterfuges regarding the fair value exchanges cited by [ZD] as a non-proscribed activity between suppliers and retailers and [would] defeat the Legislature's intent to limit vertical and horizontal integration of the alcoholic beverage industry." We agree with the Department.

Viewed in the context of the purposes of the tied-house laws, ZD did not merely "purchase . . . an advertisement" as it might do, for example, in a newspaper or magazine of general circulation. Rather, ZD paid money to place wine advertisements in a licensed retailer's sales catalog. The catalog promoted Wally's exclusively, containing only Wally's telephone number, fax number, and address and only information about the products sold at Wally's and how to order them from Wally's. The catalog was then sent to over 125,000 consumers in the Los Angeles area, bringing Wally's and all of

its products directly to the consumer's doorstep. Thus, ZD contributed a valuable and tangible benefit to Wally's by participating in paying for the production of its exclusive sales catalog—in essence, a "virtual" retail establishment.

The Department's decision that this violated the prohibition against a winegrower's furnishing anything of value to a retailer is consistent with the legislative purpose of the tied-house laws, as articulated in the *California Beer Wholesalers* decision. There, the Supreme Court made clear that all "firms operating at one level of distribution were to remain free from involvement in, or influence over, any other level." (*California Beer Wholesalers, supra,* 5 Cal.3d at p. 408.) An ongoing relationship between a winegrower and a retailer such as that between ZD and Wally's could easily lead to the kind of influence of a supplier over a retailer the statutes were intended to prevent, for example, by causing the retailer to favor or "push" the products of the wholesaler who chooses to pay for advertising in the retailer's catalog. " '[T]he [tied-house] prohibition . . . exists primarily to remove the influence by the manufacturer over the wholesaler and the wholesaler over the retailer, a practice which might result in preference for the manufacturer's or wholesaler's product. . . .' 32 Ops.Cal.Atty.Gen. 75, 76 (1958)." (*Id.* at p. 408, fn 8.)

ZD contends the 1937 opinion, interpreting the statutory predecessor to section 25502, and relied upon by the Board, is controlling. In that opinion, the Attorney General concluded the statute would not be violated "if advertising were placed [by a supplier] in the magazine of a club which held an on-sale license, where the magazine was circulated to the members and friends of the club at their homes or offices, even though a few copies of the magazine might also be retained in the reading rooms of the club." (1937 opn.) The Attorney General construed the word "giving" in the statute to mean "donating" and, therefore, opined that a "bona fide purchase of advertising space" would not be prohibited. (*Ibid.*) The Department did not act unreasonably in declining to follow this opinion.

 First, while an opinion of the Attorney General is entitled to great weight, it is not controlling legal authority. This is particularly true where, as here, there is case authority in existence interpreting the statute at issue.[2] (*Thorpe v. Long Beach Community College Dist.* (2000) 83 Cal.App.4th 655, 662-663 [99 Cal.Rptr.2d 897].) Furthermore, the facts upon which the 1937 opinion was predicated are substantially different from

---

[2]ZD correctly argues that there is no legal authority that directly interprets subdivision (a)(2) of section 25502. However, *California Beer Wholesalers,* cited by the Department in its

the stipulated facts presented for review in this case. The 1937 opinion involved advertising in a club's magazine, not in the sales catalog of a retailer. Presumably, the magazine was a club newsletter, not a means for soliciting mail-order purchases by club members from the club.[3] Thus, the benefit of the advertising in the club's magazine would inure to the advertiser whose purpose is to generate sales of its product at bars, restaurants and stores. The Attorney General was not asked to comment upon a situation where, as here, the benefit of the advertising would inure not only to the advertiser, but also to a single off-sale retail licensee.

ZD next contends that the Department's interpretation of section 25502, subdivision (a)(2) would lead to the absurd result of prohibiting winegrowers or suppliers from purchasing *any* goods and services from any licensed retailers. It argues that if the purchase of an advertisement placement is prohibited under section 25502, subdivision (a)(2), then the purchase of any goods or services from a licensed retailer, whether a loaf of bread, a tube of toothpaste or a pound of onions is also a prohibited purchase. But the purchase of a loaf of bread at a grocery store is not analogous to the placement of a wine advertisement in a retailer's catalog; the "thing of value" furnished here related directly to sales of alcoholic beverages. As the Department noted, it "exercises its discretion to not consider regular commercial transactions unrelated to the sale or distribution of alcoholic beverages as a violation of Section 25502(a)(2)."

ZD counters with the contention that the "regular consumer transactions" exception is, in effect, an improper, ad hoc amendment to the statute and, therefore, the Department has not proceeded as required by law and its decision is in excess of its jurisdiction.[4] ZD also contends the Department's decision renders the reach of the statute "unknown and unknowable" and is an invitation to arbitrary and discriminatory enforcement actions by the

---

decision, contains an extensive discussion of the tied-house laws generally and of section 25502 specifically.

[3]Indeed, in the context of the law prohibiting a supplier from advertising on the premises of a retail establishment, the 1937 opinion distinguishes between a magazine in general circulation and a program handed out where a licensed retail establishment conducts business, such as at a baseball game.

[4]ZD argues: "In essence the Department's newly promulgated 'enforcement condition' . . . would rewrite Section 25502 to state: [¶] 'No [supplier] . . . shall . . . [f]urnish, give, or lend any money or other thing of value OR PURCHASE, directly or indirectly, to, OR FROM . . . , any person engaged in operating, owning, or maintaining any off-sale licensed premises UNLESS THE DEPARTMENT DETERMINES IN ITS DISCRETION THAT SUCH CONDUCT (A) IS NOT IN CONNECTION WITH OR UNRELATED TO THE SALE OR DISTRIBUTION OF ALCOHOLIC BEVERAGES AND (B) HAS BEEN PERFORMED BY SUCH SUPPLIER . . . IN THE CAPACITY OF AN INDIVIDUAL OR REGULAR CONSUMER.'"

Department. This contention fundamentally ignores both the authority conferred on the Department by the Constitution to exercise "its discretion, to deny, suspend or revoke any specific alcoholic beverages license" (Cal. Const., art. XX, § 22, par. 9) and the power conferred on the Department by statute to liberally construe and strictly enforce the alcoholic beverage control laws (§§ 23001 & 23049). It is thus well within the Department's purview to determine that section 25502 applies to certain transactions but not to others.

The fact that the application of section 25502, subdivision (a)(2) has been and will be subject to interpretation by the Department in the exercise of its discretion is unremarkable. Hundreds of laws and regulations are subject to interpretation and application by state and local agencies designated to administer them; in so doing, the exercise of discretion is common. And the courts routinely review these decisions for "abuse of discretion." (Code Civ. Proc., § 1094.5.) As with other agencies, the Department's discretion is circumscribed by articulated standards and is subject to both administrative and judicial review. (§§ 23084 & 23090.2; see also *Kirby v. Alcoholic Bev. etc. Appeals Bd., supra*, 33 Cal.App.3d at p. 738 [court upheld the Department's interpretation of a statute because it was a "reasonable" one, while noting that a different interpretation would have been unreasonable].) Accordingly, we need not address or anticipate the specter, conjured by ZD, of arbitrary and subjective decisionmaking by the Department in determining what is and is not prohibited under section 25502, subdivision (a)(2).

ZD contends that section 25502, subdivision (a)(2) cannot prohibit paid advertising through a retailer's mailed catalog because section 25503, subdivision (h), which governs other prohibited conduct between suppliers and retailers, specifically prohibits only *on-premises* advertising. Therefore, ZD reasons, any other kind of advertising must be permitted. First, this contention cannot be correct, because if it were, then section 25503.3, subdivision (b)—permitting a supplier to advertise in the publication of a bona fide trade association *only* "if that publication does not advertise on behalf of, or directly benefit, any individual retail licensee"—would be superfluous. Additionally, in this day and age, it would make no sense to prohibit advertising on the *premises* of a retailer but allow advertising in a retailer's exclusive *catalog*. For mail order houses, the catalog is often the only "premises" the retailer has.

A similar argument was rejected by the California Supreme Court in *California Beer Wholesalers*. There, the Department denied the application of a licensed off-sale retailer for a wholesale liquor license as being a

violation of the tied-house provisions of section 25502. The Board reversed the Department's decision, applying the following reasoning: Section 25502 provides that no wholesaler of beer, wine or distilled spirits may hold an interest in a retailer's off-sale liquor license. But section 25506 by its terms only prohibits a retailer from holding any interest in the business of a "distilled spirits wholesaler, . . . manufacturer, . . . or manufacturer's agent." Therefore, under the doctrine of *inclusio unius est exclusio alterius* a retailer is free to acquire a wholesaler's beer and wine license. (*California Beer Wholesalers, supra,* 5 Cal.3d at pp. 405-406.) The court disagreed. "[T]he attempt to use section 25506 to nullify the general prohibition of section 25502 would also nullify the Legislature's basic objective of erecting a triple-tiered system of distribution and licensing and would thereby weaken the entire framework of the statutory structure." (*Id.* at p. 411.) Similarly, here, the narrow prohibition contained in section 25503, subdivision (h) cannot be used to nullify the general prohibition of section 25502 and the basic objective of the tied-house statutes.

Finally, ZD makes the unadorned assertion that the only constitutionally permissible interpretation of section 25502 would be one which allows ZD to place paid advertising *anywhere* except on the premises of a retailer, citing *Actmedia, Inc. v. Stroh* (9th Cir. 1986) 830 F.2d 957. ZD complains that the Department "ignores *Actmedia* and its analysis" and engages in a " 'duck and avoid' technique" by "asserting that administrative agencies cannot declare a statute unconstitutional." In our opinion, however, it is ZD who "ducks" the issue. ZD fails to provide this court with its own analysis of *Actmedia* or any other relevant authority, as applied to the facts in this case, which might lead us to conclude that the Department's enforcement action under section 25502 in this limited context creates a constitutional question.[5] Mere suggestions of error without supporting argument or authority other than general abstract principles do not properly present grounds for appellate review. The court is not required to make an independent, unassisted study of the record in search of error. The point is treated as waived and we pass it without further consideration. (*Lowery v. Robinson* (1965) 238 Cal.App.2d 36, 39 [47 Cal.Rptr. 495]; *Interinsurance Exchange v. Collins* (1994) 30 Cal.App.4th 1445, 1448 [37 Cal.Rptr.2d 126].)

ZD's reliance on *Actmedia* seems to be misplaced, in any event, because the rationale of *Actmedia* supports, rather than undercuts, the Department's

---

[5]For example, ZD nowhere mentions the four-part analysis set forth in *Central Hudson Gas & Elec. v. Public Serv. Comm'n* (1980) 447 U.S. 557, 566 [100 S.Ct. 2343, 2351, 65 L.Ed.2d 341], which provides the framework for testing the constitutionality of laws that limit commercial speech.

decision. There, the court related the legislative history of the alcoholic beverage control laws. (*Actmedia, Inc. v. Stroh, supra,* 830 F.2d at pp. 959-961.) *Actmedia* concluded that section 25503, subdivision (h) (prohibiting suppliers from purchasing on-premises advertising from retailers) was designed to "eliminate the possibility that such [advertising] payments could be used by large-scale operators to purchase favored treatment for their products by individual retailers, or even exclusion of their products' competing brands. . . . The concern that advertising payments could be used to conceal illegal payoffs to alcoholic beverage retailers appears to have been widely held at the time of section 25503(h)'s enactment, . . . and we 'hesitate to disagree with the accumulated, common-sense judgments of [the] lawmakers' who originally enacted the provision or who have retained it in effect. [Citation.]" (*Actmedia,* at pp. 966-967.)

The same rationale applies to section 25502, subdivision (a)(2) and the extant facts. Here, the manufacturer paid for advertising in the exclusive catalog of the retailer. Unquestionably, the purpose of the exclusive catalog was to have the consumer purchase the winemaker's product *from the retailer.* This creates the potential for manufacturers and suppliers to gain "favored treatment for their products by individual retailers, or even exclusion of their products' competing brands" in violation of the tied-house laws. (*Actmedia, Inc. v. Stroh, supra,* 830 F.2d at pp. 966-967.) Further, a flat prohibition precluding manufacturers from making any payments to retailers for advertising has the salutary effect of "eliminat[ing] any danger that such payments will be used to conceal illegal payoffs and violations of the tied-house laws . . . ." (*Id.* at p. 967.)

E. *No Applicable Exception to Section 25502 Governs These Facts*

Having concluded that the Department correctly found the elements of a violation of section 25502, subdivision (a)(2) were established, it remains for us to determine whether such conduct is otherwise authorized anywhere else in the Act.[6] Our review of the Act turns up no authorization for supplier/winegrower licensees to pay for advertising in a catalog for a single retail licensee. To the contrary, the Legislature specifically authorized suppliers to advertise in "any regular publication of a bona fide trade association the members of which are . . . retailers" *but only if* that publication "does not advertise on behalf of, or directly benefit, any individual retail licensee." (§ 25503.3, subd. (b).) As noted by the Department, if section 25502, subdivision (a)(2) is somehow construed to allow suppliers to advertise in

---

[6]Section 25502, subdivision (a)(2) prohibits a supplier from furnishing anything of value to a retailer "except as authorized by this [Act]."

the catalog of a single retailer, why would the Legislature have created this exception allowing suppliers to advertise in a generic trade association publication so long as the publication does *not* benefit an individual retailer? We conclude the Legislature could not have intended to make an exception where there was no rule.

## III. DISPOSITION

In this proceeding we do not determine whether the decision of the Board can or should be affirmed; we determine only whether the Department's decision must be overturned based on any of the grounds set forth in section 23090.2. For the reasons set forth above, we hold—and the Board appears to concede—that the Department's interpretation of the statute is a rational one. Accordingly, it was error for the Board to substitute its own interpretation for that of the Department, nor are we allowed to supplant the Department's decision with one of our own. Having discovered no grounds for reversing the Department's decision, the Board's decision is vacated and the decision of the Department is reinstated.

Reardon, Acting P. J., and Sepulveda, J., concurred.