Filed 4/17/26  S.W. v. Superior Court CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| S.W.,<br><br>      Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF DEL NORTE COUNTY,<br><br>      Respondent;<br><br>DEL NORTE COUNTY DEPARTMENT OF HEALTH AND SOCIAL SERVICES et al.,<br><br>      Real Parties in Interest. | A175561<br><br>(Del Norte County Super. Ct. Nos. JV256025, JV256026) |

On May 21, 2025, 23-month-old A.N. and 12-month-old I.N., Jr., were removed from the custody of their parents S.W. (mother) and I.N. (father) after police responded to father's overdose on fentanyl and found fentanyl and unknown pills in the home and within the reach of the children.  Mother filed a writ petition for extraordinary relief to overturn the trial court's order terminating reunification services and setting a Welfare and Institutions Code[1] section 366.26 hearing to establish a permanent placement plan for the

---

[1] Further undesignated statutory references are to the Welfare and Institutions Code.

1

children.  Mother contends there is not substantial evidence that the Department of Health and Human Services (DHHS) offered or provided reasonable reunification services to her, and thus, the trial court erred in terminating her reunification services and setting the matter for the section 366.26 hearing.  She also requests an immediate stay of the hearing.  We disagree with mother's contentions and deny the petition and the request for stay.

### BACKGROUND[2]

On May 21, 2025, the Crescent City Police Department responded to a report that father was overdosing on fentanyl in the home with the children present.  Officers contacted DHHS requesting an immediate response because "the home was unsafe for the children" and also reported there had been multiple calls to the residence for domestic violence.

Responding social workers observed the apartment to be "extremely cluttered and unsanitary for young children."  In the living room, they found "boxes, bags and other miscellaneous items stacked against walls and throughout the room posing a fire hazard as well as a hazard to the physical health of the children" because the stacked items could fall on the children.  The bedroom where I.N., Jr. was found was "so cluttered [that] the door could not be fully opened due to the items stacked behind the door."  The door to the room where A.N. was found had several holes punched into it.  On a television stand inside the room within A.N.'s reach were "unidentified pills, cigarette butts, what appear[ed] to be a pipe for smoking substances, and what appear[ed] to be cartridges for pens used to smoke marijuana," as well

_____

[2] Father did not timely file a writ petition in our court; we provide only the facts necessary to resolve mother's claims.

2

as a small bong.  There were also two dogs in the room and "dog feces throughout the floor."

Fentanyl had been found on the bathroom counter and removed by law enforcement; additional fentanyl was still visible on the bathroom floor. Mother told the social workers that she was at Walmart when father overdosed and the children had been in the care of her grandmother.

As a social worker explained to mother, the children were placed in protective custody with law enforcement because of the condition of the home, the "very dangerous substances that were in reach of the children as well as the extensive history of reports" DHHS received about her and father—specifically, relating to substance abuse and domestic violence.

## I.  Detention and Jurisdiction

On May 23, 2025, DHHS filed two substantively identical petitions against the parents alleging each child fell within the jurisdiction of the juvenile court under section 300, subdivision (b)(1) because they suffered or there was a substantial risk that they would suffer serious physical harm or illness as a result of the willful or negligent failure of the parents to supervise or protect the children adequately from the conduct of the custodian with whom they had been left and by the willful or negligent failure of the parents to provide regular care for the children due to the parents' mental illness, developmental disability, or substance abuse.

Specifically, the petitions alleged:  mother has a substance abuse problem that impacts her ability to care for her children and has exposed the children to substances including marijuana, fentanyl, and unknown pills; mother has a history of substance abuse, noting her positive test for methamphetamine while pregnant with I.N., Jr.; mother has failed to protect the children from exposure to domestic violence, noting that mother is

3

"clearly a victim of domestic violence such as physical violence inflicted by the father" but continues to allow father to live in the home and denies violence; and mother has failed to protect her children from exposure to substance use by father when she left the children in the care of father and was not present when he overdosed on fentanyl.

Mother is an enrolled member of the Yurok Tribe. Father reported no known Native American ancestry. According to the petition, the Indian Child Welfare Act (ICWA) manager for the Yurok Tribe represented to DHHS that the children were not eligible for enrollment.

The court calendared a detention hearing for May 27, 2025. The detention report (and later the jurisdiction report) that DHHS filed in advance of the hearing stated that the parents had a combined total of 22 prior referrals to DHHS dating back to 2019 and including other children. In this instance, the report recommended the children remain out of the care of their parents.

At the May 27 detention hearing, counsel were appointed for the children and for mother and father, who were both present.[3] The parents generally denied the allegations in the petitions but did not object to the children's detention. The court advised all present that because the children were under the age of three, the parents would be permitted six months of reunification services, cautioning, "it is very important" to participate in those services, because "if you're not close to being successful . . .

---

[3] Father appeared via Zoom because he was in custody at the time of the hearing. Father was on probation for a misdemeanor domestic violence conviction (mother was the victim) and was "out of compliance with probation and has been absconding since February 2025 resulting in a warrant being issued for his arrest." Father's counsel represented he was expected to remain in custody for the next five months.

reunification services may be terminated and your children then will be set for adoption . . . , which means you could lose your parental rights." The court ordered the children's continued detention with supervised visitation for the parents, whom the court directed to partake in alcohol and drug testing, substance abuse treatment, and parenting education pending further proceedings. The court scheduled the jurisdictional hearing for June 13, 2025.[4]

In the June 12, 2025 jurisdiction report prepared in advance of hearing, DHHS summarized the parents' prior child welfare reports and criminal histories. According to the report, mother was working with a representative from the Yurok wellness court and planned to enter an inpatient rehabilitation treatment, possibly with Friendship House. Mother reported that she and father were not in a relationship, but father had indicated that he would wait until she "gets the kids back and then they could work things again." The social worker reported that mother denied fentanyl use, but self-reported methamphetamine use; mother had not provided a drug test as requested.

The report stated that mother was a "no call no show" for her June 3 and June 4 visits with the children and eventually told the social worker that there had been a domestic violence incident with father on June 2, shortly after he had been released from custody.[5]

---

[4] The juvenile court also conducted an inquiry under the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.) and found for both children, "no reason to believe or reason to know the child is an Indian child and ICWA does not apply."

[5] In fact, per the jurisdiction report, "on June 4, 2025 [father] was booked and released for [Penal Code section] 243[, subdivision] (e)(l) misdemeanor domestic battery against [mother]. The same day after he was released from jail he committed [Penal Code section] 273.5 felony domestic

5

DHHS continued to express "significant concerns for the safety of the children" in the care of their parents due to multiple reports of domestic violence by father against mother, reports of fentanyl use by father, mother's apparent codependence in relationship with father, which has led to the children's abuse and neglect as they are "constantly present during incidents of domestic violence and substance use." DHHS recommended that the children remain in out-of-home care while the parents make steps to obtain sobriety and mitigate DHHS's safety concerns.

The report was admitted into evidence at the June 20 jurisdiction hearing; mother did not object to jurisdiction and did not present any evidence but argued the report was not factually accurate.[6] The juvenile court found true by a preponderance of the evidence the allegations in the petitions and sustained the petitions under section 300, subdivision (b). The court adopted the recommendations of DHHS and ordered the continued detention of the children with supervised visitation with the parents for a total of five hours per week, per parent. The court referred the matter to the joint wellness court and scheduled a disposition hearing.

## II. Disposition

On July 17, 2025, DHHS filed a disposition report recommending the children be declared dependents of the juvenile court and remain in out-of-home care to support their safety and well-being and that the parents be offered family reunification services. The report listed mother's and father's problems requiring intervention: substance abuse, domestic violence,

---

assault against [mother] as it was reported he assaulted her and pushed her out of the vehicle then fled the scene and there is an active [Penal Code section] 836 BOLO out for him. [Father] has a court date on June 12, 2025, due to absconding from probation and his arrest on or about May 26, 2025."

[6] Father was not present.

housing/resource management, and parenting practices. The report listed efforts made to assist the parents, including program and drug testing referrals, communications with the Yurok Tribe, and the provision of gas vouchers and cell phones. The report described mother as "very consistent in her visitation and demonstrates that she has a strong bond with her children" and a willingness to engage in services. Although DHHS commended mother for her efforts, it also represented that mother "struggled to engage fully in services." DHHS was "concerned that [mother] is not completely ready to address her substance abuse" because she failed to follow through on inpatient rehabilitation treatment. DHHS was also fearful that because father had not engaged in any services and the status of the parents' relationship was "incredibly violent," "the children could end up seriously injured or even dead" with continued exposure to violence and fentanyl in the home.

Mother's case plan objectives included directives to stay free from illegal drugs and to show her ability to live free from drug dependency; comply with all required drug tests; "[c]onsistently, appropriately and adequately" parent the children; obtain and maintain a stable and suitable residence; "demonstrate she is able to understand how domestic violence impacts the safety and well-being of her children in addition to her own health and safety." Under the case plan, mother's "responsibilities" were to participate in domestic violence and parenting programs, submit to random drug testing or use of a "sweat patch" and an alcohol and other drug (AOD) assessment (the recommendation from which she would follow the treatment plan); mother was also to seek housing through eligible programs such as Housing and Urban Development (HUD) and "Tribal Housing, [and] Family Stabilization."

7

At the July 18, 2025 disposition hearing, the court admitted the disposition report into evidence without objection, and the parties submitted on the report's recommendations without argument. DHHS informed the court that it had referred mother to the joint wellness court, but the Yurok Tribe did not think she was eligible because the children were not eligible for enrollment. Mother requested another referral to the joint wellness court because she claimed to be receiving most of her services through the Yurok Tribe. The court adopted the recommendations of DHHS and ordered reunification services pursuant to the case plan. The court also appointed a special advocate (CASA) to act in the children's best interests. The court set a six-month review hearing for January 16, 2026, pursuant to section 366.21, subdivision (e).

### III. Six-Month Family Reunification Review

On January 8, 2026, DHHS filed its status review report. DHHS recommended that the children remain as dependents and in out-of-home placement, and that "family reunification services to . . . [the parents] be terminated and that a 366.26 hearing be set to identify a permanent plan for the children." According to the report, the parents had not obtained stable housing, and DHHS had "ongoing concerns" that the parents had not followed through with participating in services and had "safety concerns regarding substance abuse and domestic violence."

The report described the services provided to mother and her lack of compliance: mother had not secured independent housing and was living with her own father and with father, had not been consistently drug testing, did not attend or reschedule her appointment to get a sweat patch, failed to make contact with AOD, resulting in the closure of her referral, was found ineligible for the Yurok Tribe's Joint Jurisdiction Family Wellness Court, did

8

not sign up for parenting class or other recommended/required classes, had been "difficult to reach" despite being provided with two cell phones that were both "lost," and had not been in consistent communication with the social worker.  Regarding visitation with the children, mother had consistently appeared initially but then had nine "no call/no shows."  When mother failed to appear, the "children's behaviors would regress," and A.N. "would scream for a long period . . . and throw things both at daycare and at home."  At one visit, mother appeared with a black eye she represented was from a fight with father.  On another occasion, her empty water bottle smelled of alcohol, which was concerning because she allowed the children to drink out of her water bottle.

The CASA filed a report also recommending that the children remain dependents and in their current placement.  The children were "thriving, healthy and bonded in their current placement" but had emotional issues including "night terrors, bouts of uncontrollable crying and tantrums," which had decreased dramatically and only appear when their mother does not show for visitation.  According to the CASA, "Besides visitation, the parents have not made any efforts to comply with the case plan ordered by the court."

On January 16, 2026, the juvenile court began the six-month review hearing.  The court admitted the reports into evidence without objection, and the parties, through father's counsel, initially submitted on the reports' recommendations.  However, midway through the court's reading of the findings and orders, both parents arrived at the hearing.  Mother represented that she planned to go to Friendship House, an inpatient rehabilitation center through the Yurok Tribe, on the following Thursday, and parents jointly asked the hearing be continued.  The juvenile court granted the continuance request "for due process," over DHHS's objection.

9

At the continued January 23, 2026 six-month review hearing, mother contested the recommendation for termination of reunification services and requested an evidentiary hearing, which commenced immediately.[7]

## A.  Arianna Madrigal's testimony

Arianna Madrigal is the social worker who had been assigned to mother's case since August 2025.  She testified consistently with DHHS's report but elaborated on mother's non-compliance with her case plan. Madrigal testified that mother was challenging to communicate with throughout the reunification period because she lost the phones given to her by DHHS and otherwise provided numbers that "would go to voicemail, or they would ring and there would be no answer."  Madrigal testified that mother looked into getting housing at the Oxford House, a sober living house in Crescent City, but they would not admit her because she was not sober. Madrigal represented that she had provided mother with a HUD application (the only housing services offered by the county) and asked if she wanted assistance completing it, but mother "said she wanted to do it" and then never submitted the form.

Madrigal did not know if mother was getting any drug services from the Yurok Tribe.  Mother only appeared for drug testing on two occasions, despite being sent notifications by DHHS:  one in July 2025, which was positive, and one in August 2025, which was negative.  Madrigal testified that she believes mother still needs assistance with her drug addiction.

Madrigal explained that domestic violence "was a big concern in this case" as "[father] continues to live at [mother's] father's house with her." Mother was offered a domestic violence course through the Yurok Tribe and

---

[7] Father was not present.

was not provided alternate supportive services from the county because "That's what [mother] wanted to do."

## B. Mother's Testimony

Mother testified on her own behalf. After the children were initially detained, mother represented she went to the joint wellness court at least three times. Mother confirmed that Madrigal could not easily get a hold of her because of her lack of a phone and a vehicle.

Mother testified that she was unable to get into the Oxford House because she was struggling with substance abuse at the time. Mother represented that she has struggled with substance abuse "on and off" but planned to go to the Friendship House in San Francisco on Monday morning.[8] Mother learned of Friendship House from the Yurok Tribe about a "month or two after the kids initially gotten taken away" but did not enroll in the Friendship House at that time for "no real reasoning." Mother was sober "[f]or a period" and wants to be sober.

Mother testified that Madrigal took her to pick up the HUD application but did not give her guidance; she claimed Madrigal only asked whether she needed a ride to turn the paperwork in when it was completed. Mother has been struggling with homelessness and "might have part way" completed the HUD application.

Mother testified that she enrolled in programs with the Yurok Tribe including a parenting program, a domestic violence program, and "the Red Road." Mother represented that she "attended them for about a month or so." Mother believed she was currently enrolled with the wellness program through the Yurok Tribe, but she was "not hundred percent" sure. She believed her commitment to complete the program at the Friendship House

---

[8] The hearing occurred on a Friday.

was part of the wellness program, which she intends to complete. She would like the children to be able to go with her to Friendship House. Mother believed the visits with the children went "particularly pretty well," and lately A.N. would not want her to leave. She denied ever taking alcohol to a visit with the children.

Mother testified that she met with Madrigal on a few occasions over the previous "several months." Mother represented that the county provided two parenting class options, one through the county and another through the Yurok Tribe, but the domestic violence class was only through the Tribe. Mother acknowledged that domestic violence courses were a part of her case plan, and she began the classes but did not finish them; she attended two classes per week for "about a month and a half" in August 2025.

As to her relationship with father, mother represented that they were no longer in a relationship because he was "in and out" of the house. Mother acknowledged father has "gotten in trouble" for domestic violence against her in the past, but she believed that he might be able to be a father in the future and said she would not allow him to be around the children if he was using drugs or alcohol.

## C. Rhonda McCurdy's Testimony

Rhonda McCurdy is the alcohol and drug counselor for the Yurok Tribe's wellness court and had been mother's case manager since June 2025.[9] She was in contact with mother over the phone in June and August, but she was not easy to get a hold of in September and October; McCurdy stopped reaching out to mother in November 2025. Two weeks prior to the

---

[9] McCurdy works as support staff for both the tribal court and the joint jurisdiction court and explained that the joint jurisdiction court involves Del Norte social services, ICWA social services, a Yurok judge and the juvenile court judge. It is separate from the family wellness court.

12

jurisdiction hearing, mother contacted McCurdy asking for assistance in enrolling in Friendship House for treatment. McCurdy testified that the Yurok Tribe's domestic violence course was 52 weeks long, but they "lost the contract back in August" so their program no longer exists.[10]

## D. Juvenile Court's Findings

After hearing arguments from the parties, the court found that DHHS "complied with the case plan by making reasonable efforts to return the children to a safe home through the provision of reasonable services designed to aid in overcoming the problems that led to the initial removal . . . ." The court further found that neither parent made any progress toward alleviating or mitigating the causes necessitating placement and thus, by clear and convincing evidence, the parents "failed to participate regularly and make substantive progress in a court-ordered treatment plan and there is not a substantial probability of return within six months"; the court then terminated reunification services. In doing so, the court noted that it did not find much of mother's testimony credible "due to the continuing substance abuse and the denial of alcohol" in her water bottle at the visit with the children and also made "the inference . . . that the parents are still together. It's abundantly clear they are. . . . So the domestic violence component is important." The juvenile court scheduled a section 366.26 hearing for May 11, 2026.

---

[10] McCurdy also testified that the children were ICWA children because they are descendants of the Yurok Tribe. This new information spurred the court to state that the Yurok Tribe may "have an ICWA notice compliance problem" and ordered DHHS to do a further ICWA inquiry. At a subsequent hearing on February 6, 2026, the admitted DHHS addendum report represented that the ICWA tribal welfare director had informed DHHS that the Yurok Tribe's enrollment guidelines had not changed and the children remained ineligible for enrollment.

Mother timely filed this writ petition.

## DISCUSSION

Mother contends that the trial court erred in terminating reunification services and scheduling the section 366.26 hearing because the court's finding that she received reasonable reunification services is not supported by substantial evidence.[11] We disagree.

"When a child has been removed from a parent's custody, the court ordinarily must order child welfare services designed to facilitate the reunification of the family." (*Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 624 (*Michael G.*).) For children under the age of three at the time of initial removal, "services shall be provided for a period of 6 months from the dispositional hearing . . . , but no longer than 12 months from the date the child entered foster care." (§ 361.5, subd. (a)(1)(B).)

At the six-month review hearing, the juvenile court "shall order the return of the child to the physical custody of their parent . . . unless the court finds, by a preponderance of the evidence, that the return of the child to their parent . . . would create a substantial risk of detriment to the safety,

---

[11] Rule 8.204(a)(1)(C) of the California Rules of Court requires all appellate briefs to "Support any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears." " 'The appellate court is not required to search the record on its own seeking error.' [Citation.] Thus, '[i]f a party fails to support an argument with the necessary citations to the record, . . . the argument [will be] deemed to have been waived.' " (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246.) Here, mother's brief statement of facts and statement of the case only include only two cites, and both are to the entire record; most of her arguments similarly fail to cite to the record. These inadequacies forfeit her claim of error; however, we exercise our discretion to consider the merits. (*People v. McCullough* (2013) 56 Cal.4th 589, 593 ["neither forfeiture nor application of the forfeiture rule is automatic," and appellate courts have discretion to review otherwise forfeited challenges].)

protection, or physical or emotional well-being of the child." (§ 366.21, subd. (e)(1), (2).)  Thereafter, the "court may schedule the section 366.26 permanency planning hearing 'only if' it finds 'there is clear and convincing evidence that reasonable services have been provided or offered to the parents or legal guardians.' " (*Michael G., supra*, 14 Cal.5th at p. 625, quoting § 366.21, subd. (g)(4).)

" 'We review the juvenile court's findings for substantial evidence, and the juvenile court's decisionmaking process based on those findings for abuse of discretion.' " (*B.D. v. Superior Court* (2025) 110 Cal.App.5th 1132, 1150.) Under this standard, we do not reweigh evidence or exercise independent judgment but review the record "in the light most favorable to the court's determinations and draw all reasonable inferences from the evidence to support the findings and orders." (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688–689.)

It is well-established that "Reunification services need not be perfect." (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 972.)  Rather, the standard is "whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.)  " 'The adequacy of the reunification plan and of the department's efforts to provide suitable services is judged according to the circumstances of the particular case. . . .  "[T]he record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult. . . ." ' [Citations.]" (*In re K.C.* (2012) 212 Cal.App.4th 323, 329–330.)

15

Mother argues DHHS failed to meet the statutory standards for reasonable services. First, mother contends that the statutory framework for children under age three requires heightened statutory requirements that were not met because the "urgency" of the timeline "was not communicated to the parent and the services were not fashioned after her needs." She asserts DHHS failed to provide a proper domestic violence program because the program she was referred to does not exist. Next, mother argues that the social worker "did little to assist other than to deliver her to HUD for an application and to provide her with a list of treatment." Mother argues that the social worker should have offered a tribal option for both housing and AOD and Madrigal was unaware of the Yurok Tribe's services offered. Mother claims that she made substantial progress in areas where she was provided reasonable services, which therefore supports a conclusion that there was "no substantial evidence that she was provided reasonable services in her overall case plan" and means the court erred in terminating services at six months. Finally, mother contends that DHHS failed to meet its burden to "prove beyond clear and convincing evidence that there is not a substantial likelihood that the children would not be returned to Mother within 6 months."

Substantial evidence supports the juvenile court's finding that DHHS provided mother with reasonable reunification services. In order to address the main reasons for the children's removal—substance abuse and domestic violence—DHHS referred mother to a variety of services, including the HUD housing program, the Yurok Tribe's domestic violence program, a parenting program, an AOD assessment and treatment plan, random drug testing or the use of a sweat patch, and regular visitation with the children. But mother did not submit the HUD housing application, and mother represented

16

she did not want an alternate domestic violence program referral because she wanted to attend the Yurok program (which she stopped attending well before it was discontinued). Madrigal gave mother two separate cell phones to maintain communication, but mother lost them both and separately changed the phone number she provided to DHHS several times. Madrigal sent mother repeated reminders and notifications to drug test, but mother only drug tested twice; one test was positive, and her last test was in August 2025, over six months before the jurisdiction hearing. Mother did not attend her scheduled appointment to get a sweat patch or reschedule it. Mother was unable to obtain housing at the Oxford House because she was not sober. Mother failed to contact AOD, and they closed her referral. Mother testified that she learned of Friendship House about a "month or two" after the children were detained, but she only reached out two weeks before the six-month review hearing.

Mother acknowledged she was difficult to contact and did not submit her HUD application. Although Mother represented that she enrolled in programs with the Yurok Tribe including a parenting program, a domestic violence program, and "the Red Road," she only "attended them for about a month or so." Mother appeared for visits with the children initially after their detention but then failed to appear or appeared late on numerous subsequent occasions.

Courts have long held that "Reunification services are voluntary, and cannot be forced on an unwilling or indifferent parent," and mother's lack of engagement with the services offered by DHHS or the Yurok Tribe until immediately before the jurisdiction hearing does not mean that DHHS did not provide her with reasonable services. (*In re Jonathan R.* (1989) 211 Cal.App.3d 1214, 1220; see also *In re Michael S.* (1987) 188 Cal.App.3d 1448,

17

1463, fn. 5 ["The requirement that reunification services be made available to help a parent overcome those problems which led to the dependency of his or her minor children is not a requirement that a social worker take the parent by the hand and escort him or her to and through classes or counseling sessions"].)

Mother's contention that the urgency of the six-month timeline under section 361.5 was not communicated to her is baseless. The court explicitly advised her orally multiple times about the six-month timeline designated by statute. For example, at the detention hearing, the court told the parents "Because your children are under the age of three, you'll be allowed six months of reunification services. It is very important if those services are offered that you participate because if you are successful within that time period, your kids will be returned. If for some reason you are not and you're not close to being successful, potentially, at that time period, reunification services may be terminated and your children then will be set for adoption . . . , which means you could lose your parental rights." The court gave a similar advisal at the disposition hearing in July 2025. The court explained at both hearings that if the parents failed to make progress, services may be terminated. The court explicitly encouraged the parents to communicate if they needed additional services. Mother made no such complaints and instead failed to participate in her case plan.

Similarly, the record does not support mother's claim that her services were not tailored to her needs. The services offered match mother's objectives as set forth in her case plan. Mother was struggling with substance abuse and putting the children at risk, so she was provided drug testing and an AOD assessment and treatment plan. Mother was exposing the children to domestic violence and without a stable living situation, so

18

DHHS offer her domestic violence referrals and housing assistance. In addition, mother was referred to parenting classes to ensure she was "consistently, appropriately and adequately parenting her children." We fail to see how these programs were not sufficiently tailored to mother's case issues of substance abuse domestic violence, housing management, and parenting practices.

Next, mother's complaints about the adequacy of the services provided are similarly baseless. Mother's challenge to the propriety of the referral to domestic violence classes with the Yurok Tribe because "there is no such program offered" mischaracterizes the record, which shows that mother attended two Yurok classes per week for "about a month and a half" in August 2025, but she stopped attending. As McCurdy testified that the Yurok Tribe "lost the contract back in August," had mother in fact been attending, she could have been referred to an alternate program instead of waiting for the jurisdiction hearing to learn "the program no longer exists."[12] Similarly, mother's complaint about the inadequacy of support given her to find housing ignores the HUD assistance given and the referral to Oxford House, where she was denied admission because she was not sober. Regardless, even if more services could have been provided despite mother's failure to follow through on DHHS's offerings, that does not render DHHS's

---

[12] Mother's reliance on *Amanda H. v. Superior Court* (2008) 166 Cal.App.4th 1340, is inapposite because there the court found the county failed to provide reasonable reunification services because the mother had been told she was participating in the required programs, but then, at the end of the review period, the social worker told the mother that her program enrollment was insufficient and recommended termination of services on that basis. (*Id.* at p. 1347.) By contrast, here, mother was referred to and assisted in enrollment in a plethora of programs but either failed to or discontinued her participation.

services unreasonable under the circumstances. (See *In re Misako R.*, *supra*, 2 Cal.App.4th at p. 547 ["In almost all cases it will be true that more services could have been provided more frequently and that the services provided were imperfect"].)

Most significantly, contrary to mother's claim that she had made substantial progress in the areas where she was provided reasonable services and therefore should have been given more time, the record in fact shows that mother failed to make substantial progress in her case plan in the six-month period. As stated above, mother enrolled in a few of the programs to which she was referred, attended for a few weeks, and then stopped attending. Mother did not consistently participate in drug testing and failed to maintain sobriety. She continued to live with father and appeared for visitation with the children sporadically, and once with a black eye, raising safety concerns for both children and issues of regression for A.N. Mother did not seek help from the Yurok Tribe until two weeks before the jurisdiction hearing, which was technically outside the six-month period. Under these circumstances, substantial evidence supports the court's determination that DHHS " 'made reasonable efforts to assist [her] in areas where compliance proved difficult.' " (*B.D. v. Superior Court*, *supra*, 110 Cal.App.5th at p. 1154.)

Last, mother's assertion that the county failed to meet its burden to "prove beyond clear and convincing evidence that there is not a substantial likelihood that the children would not be returned to Mother within 6 months" because reasonable services were not offered is unsupported. Mother cites no authority for this proposition other than the definition of the clear and convincing standard. Because "Mere suggestions of error without supporting argument or authority other than general abstract principles do

20

not properly present grounds for appellate review" (*Department of Alcoholic Beverage Control v. Alcoholic Beverage Control Appeals Bd.* (2002) 100 Cal.App.4th 1066, 1078), we may treat her contention as waived. (*In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830). In any event, for all the reasons articulated above, on this record, we cannot say DHHS failed to provide reasonable services sufficiently tailored to mother's needs, and substantial evidence supports the court's determination.

## DISPOSITION

Mother's petition for extraordinary writ is denied; her request for stay of the May 11, 2026 hearing is similarly denied. Our decision is final as to this court immediately. (Cal. Rules of Court, rules 8.452(i), 8.490(b)(2)(A).)

DESAUTELS, J.

We concur:

STEWART, P. J.

MILLER, J.

*S.W. v. Del Norte County Superior Court; Del Norte County Department of Health and Social Services et al., RPI* (A175561)